COLECO INDUSTRIES, INC., Plaintiff,

v.

Abe BERMAN et al., Defendants,

v.

ZELNICK, SOBELMAN & COMPANY,
Third-Party Defendants.

Civ. A. No. 73–2790.

United States District Court,
E. D. Pennsylvania.

Aug. 9, 1976.

As Amended Dec. 1, and Dec. 21, 1976.

David Berger, Richard A. Sprague, Michael K. Simon, Philadelphia, Pa., for plaintiff.

Theodore R. Mann, Daniel V. B. Pierson, E. Harris Baum, Glenn C. Equi, Bruce D. Lombardo, Philadelphia, Pa., for defendants.

### OPINION AND ORDER

HUYETT, District Judge.

### INTRODUCTION

This dispute arose, we have concluded after months of considering the legal and factual convolutions of this case, out of the frustration and need to assign fault engendered when an important business deal went sour. On June 4, 1973, after two and one-half months of negotiation, plaintiff Coleco Industries, Inc. (Coleco), a Connecticut manufacturer of recreational products, including toys, swimming pools, and swimming pool accessories, purchased Royal All-Aluminum Swimming Pool Corp. (Royal), a smaller New Jersey corporation specializing in the design, packaging, and distribution of above-ground aluminum pools. The purchase was effected by the transfer to Coleco

of all shares of outstanding Royal capital stock by the five Royal stockholders—Abe Berman, Royal's president, and Joseph Rubin, Royal's secretary-treasurer, both of whom managed Royal's daily operations, and Irvin, Lewis, and Frederick Cohen, brothers and outside shareholders.[1] Subsequent to the purchase date in June 1973, Royal's fortunes went quickly and steadily downhill and by 1975 Royal All-Aluminum Swimming Pool Corp. was inoperational. Plaintiff Coleco did not wait until 1975 to bring suit, however. Under the terms of the 1973 Purchase Agreement (Ex. 1), which contemplated both contingent and non-contingent payments to Berman, Rubin, and the Cohens,[2] Coleco, at closing, paid to the Royal shareholders $135,000 of the $500,000 non-contingent purchase price plus 6% interest. The second non-contingent payment of $57,500 plus interest was due in January 1974. Coleco initiated suit against all five Royal shareholders and Royal's accountants in December 1973, however, and made no payment beyond the amount paid at closing.

Under the complaint filed in December 1973, which is jurisdictionally grounded both in the federal securities laws and diversity of citizenship,[3] Coleco demands damages of nearly one and one-half million dollars against the five Royal shareholders, Berman, Rubin, and the Cohens,[4] for securities fraud, common law fraud, and breach of contract. The complaint also named as a defendant, Zelnick, Sobelman, & Co. (Zelnick), Royal's accountant from its inception in 1971 through the June 1973 purchase date. Just prior to trial, however, Coleco and defendant Zelnick reached a settlement which shifted Zelnick's posture in the case from that of defendant to that of third-party defendant since there remained claims against Zelnick by defendants Rubin and the Cohens. All defendants filed counterclaims demanding the remainder of the purchase price as well as repayment of their personal loans to Royal, another part of the contract consideration.[5] In addition, Berman and Rubin counterclaimed for breach of their employment contracts with Coleco executed at the same time as the Purchase Agreement and related to it.[6] Finally, the Cohen defendants crossclaimed against Berman and Rubin on the basis of a side agreement entered into at the June 1973 closing between Berman and Rubin on one hand and the Cohens on the other (Ex. 397), under the terms of which any breach damages due Coleco out of the non-contingent purchase price would come first out of Rubin's and Berman's shares.

## I

## FINDINGS OF FACT

Following almost two years of discovery and other pretrial activity, we tried this

1. Of the total of 180 Royal shares outstanding prior to purchase, Berman held sixty, Rubin sixty, Irvin Cohen thirty, Lewis Cohen fifteen, and Frederick Cohen fifteen. (Purchase Agreement, Ex. 1, ¶ 1.1)

2. The non-contingent payment amounted to $500,000 plus interest payable in four installments; the contingent payment geared to Royal's profits over three years amounted to a maximum of another $500,000. (Purchase Agreement, Ex. 1, ¶¶ 1.2–1.4)

3. Plaintiff invokes jurisdiction pursuant to 15 U.S.C. § 78aa of the Securities Exchange Act of 1934 and 28 U.S.C. §§ 1331 and 1337 and brings its federal securities claim pursuant to 15 U.S.C. § 78j(b) and Rule 10b–5. Its claims based on common law fraud and breach of contract are brought under 28 U.S.C. § 1332.

4. During the pendency of this litigation defendant Frederick Cohen was lost and presumed dead in an airplane accident. His estate has been substituted as defendant. (Tr. at 31:3946–47)

5. Under the terms of the Purchase Agreement (Ex. 1, ¶ 12.1), plaintiff was not to begin repaying defendants' personal loans to Royal until January 2, 1974. Thus, when Coleco filed suit in December 1973 and stopped all future payment under the Purchase Agreement, it stopped repayment on defendants' loans.

6. As part of the total transaction by which Coleco acquired Royal, Coleco hired Berman and Rubin as president and vice-president respectively of Royal. Moreover, a large amount of the purchase price contingent on Royal's profitability was also contingent on Berman's and Rubin's fulfilling their employment contracts. (Purchase Agreement Ex. 1, ¶ 1.4(d)(ii))

case non-jury[7] beginning November 10, 1975, and continuing, with a few interruptions, to January 29, 1976; the trial record exceeds 4000 pages. Now, having reviewed with care the notes of testimony, the documentary evidence submitted, and the post-trial briefs and proposed findings of fact and conclusions of law, we find the case ripe for decision.

For ease of understanding, we choose to document our findings of fact and conclusions of law in narrative form rather than in separately numbered paragraphs.[8] The narration that follows shortly, then, constitutes our findings of fact required under Fed.R.Civ.P. 52(a). In making our findings, we reply perhaps most heavily upon the lengthy testimony of Joseph Rubin, one of the defendants. His demeanor and the substance of his testimony impressed us greatly; he was a straightforward, conscientious, and intelligent witness. In crucial areas where his testimony contradicts that of plaintiff's witnesses, we credit Mr. Rubin's testimony. We also credit substantially the testimony of Abe Berman, especially that testimony dealing with information about Royal that he revealed to Coleco's officers, agents, and representatives prior to June 4, 1973.

A. *1971 Through March 1973*

Joseph Rubin, a mechanical engineer with a B.S. in engineering, met Abe Berman in 1968 while they were both working for Esther Williams Swimming Pool Co. Berman is a high school graduate who has worked in sales all his adult life. At Esther Williams, Rubin was responsible for the design of a new line of pools, and Berman was the company's national sales manager. Sometime in 1971, Berman and Rubin, now vice-president of Gindy Manufacturing Co., discussed seriously the prospect of their going into the swimming pool business together. As Berman explained the situation:

I don't know who brought it up or what, but the fact remained that he [Rubin] in his experience and knowledge of production and design and my experience in promotion and sales, we just felt that it would be a real good combination for starting our own company, if we could acquire capital. . . .

Tr. at 28:3609. To acquire capital, Rubin contacted Irvin Cohen, a Reading, Pa., businessman, with whom he had had business dealings and interested Cohen and through Cohen his two brothers, Lewis and Frederick, in investing in the proposed company. In addition to investing his own money, Irvin Cohen could aid Rubin and Berman in their enterprise through his contacts with Reading banks which made likely the prospect of the new company's obtaining a loan. As a result of this activity, then, Royal All-Aluminum Swimming Pool Corp. was formed in late Summer or early Fall 1971 with an initial capitalization of $84,000— $12,000 each from Rubin and Berman and $60,000 from the Cohens together. Because Irvin Cohen wanted Royal to use as its accountant the accounting firm that he employed for his other enterprises, Royal hired the firm, Zelnick, Sobelman, & Co., in the Fall of 1971 for a retainer of $300 a month. Rubin told Norman Zelnick that because he had no significant accounting knowledge (Tr. at 20:2412–13) and because both he and Berman would be constantly occupied with design, production, and sales (Tr. at 20:2412), he expected Zelnick, Sobelman, & Co. to be totally responsible for Royal's accounting including the costing of the various pool models which Royal would market. Zelnick agreed to this undertaking. Tr. at 20:2417 & 2418. Rubin designed three pools in Fall 1971, the Crest pool, which came in two sizes, the Crown pool, in two sizes, and the Jewel pool, which came in four sizes. Royal went into production in December 1971 and shipped its first pools in March

---

7. We began trial with a jury. On the joint motion of all parties, we agreed in the interest of fairness and judicial economy to dismiss the jury and proceed non-jury. (Tr. at 18:2074–78c)

8. Where the facts are substantially undisputed, we will not refer to the notes of testimony; where they are disputed, we will cite to the notes of testimony.

1972, Rubin and Berman projecting a sales total of 900 pools for the 1972 season.

In January 1972 Royal obtained a $100,000 loan from the National Central Bank in Reading. Also, in January 1972, Rubin and Berman met Leonard Greenberg, Coleco's then president,[9] at a National Swimming Pool Association trade show. Greenberg was apparently impressed with Royal's products and suggested to Berman the possibility of Coleco's acquiring Royal. Tr. at 28:3619. Berman responded that since Royal had not yet done a year's business, he thought the suggestion premature. Tr. at 28:3619. Leonard Greenberg followed up this conversation with a letter dated February 4, 1972 (Ex. 7), in which he reiterated his interest in discussing Coleco's acquisition of Royal.

Royal was to sell only 600 of the 900 pools projected in 1972, at least in part because June 1972, one of the key months for pool sales, was an inordinately rainy month and pool sales suffered accordingly. By Fall 1972, because of this discrepancy between the number of pools sold and the number projected, Royal had a substantial amount of inventory on hand for which it couldn't pay its suppliers. Its financial condition was poor, and in late 1972 and early 1973 its five shareholders made it various personal loans; some of which were repaid. The balance of the loans, $43,333.44, remained outstanding on June 4, 1973, the purchase date. Tr. at 31:3950. In addition to the loans, in early 1973 Rubin and Berman stopped drawing salaries. In spite of these financial problems, or perhaps because of them, Rubin began designing in Fall 1972 two new pools, a low cost, above-ground pool in two sizes, named the Castle, and another above-ground pool, the Camelot. The Castle design was never completed, however, because of technical difficulties encountered by Royal's suppliers of aluminum extrusions in executing parts of the designs (Tr. at 20:2448–49) and because the unpaid suppliers were reluctant to cooper-

ate with Royal. Tr. at 20:2461. In November 1972 Leonard Greenberg again approached Abe Berman at a swimming pool trade show and expressed interest in acquiring Royal. Berman promised to talk to him about the matter at a pool show they would both attend in January 1973. Tr. at 28:3621. At year end 1972 Royal was struggling. Rubin made the following assessment of Royal's financial condition as of December 31, 1972:

> We were not in good condition. We had an unbalanced inventory. We had suppliers that we owed a substantial amount of money to that were pushing us to get them money and at the same time, we were trying to work up ourselves different methods of trying to obtain capital.

Tr. at 20:2465.

January 1973 brought some relief in the forms of a $220,000 Small Business Administration loan and a $20,000 increase in Royal's loan from National Central Bank. Although this new capital was not sufficient to pay all of Royal's debts, it did start supplies flowing more freely to Royal from its main extrusion suppliers. Berman and Rubin projected total sales for 1973 as 1200 pools. In February and March, however, Royal's financial condition again worsened. Its inventory was high but out of balance. The imbalance was caused partly when Rubin was forced to substitute parts from other pool models for the parts of the Castle pool he could not, for one reason or another, get from his suppliers. Nor could Royal balance its inventory because its lack of capital discouraged suppliers from providing it with the parts it needed. This state of affairs is memorialized in the "Whereas" clauses of the Purchase Agreement:

> WHEREAS, ROYAL'S operations have produced a deficit for the twelve (12) month period ended January 1, 1973 of over One Hundred Seventy Five Thousand (175,000) Dollars; and

---

**9.** Leonard Greenberg is now Coleco's Chairman of the Board of Directors; his brother, Arnold Greenberg, is Coleco's present president.

WHEREAS, ROYAL'S operations have produced an additional deficit for the period ended March 31, 1973; and

WHEREAS, ROYAL is in immediate need of additional working capital to continue its operations; and

WHEREAS ROYAL is not presently able to obtain said additional working capital from any source;

Meanwhile Leonard Greenberg and Abe Berman had met at the pool show in January 1973. Greenberg told Berman that he thought it was time to sit down and talk about Coleco's acquiring Royal—"that he [could] make rich men out of us." Tr. at 28:3624. Rubin and Berman, exploring different avenues for providing Royal with much needed capital, agreed; eventually a meeting between Rubin and Berman and Leonard Greenberg was set to take place at the Royal plant in New Jersey on April 18, 1973.

B. *April 18, 1973 Through June 4, 1973*

On April 18, 1973, Leonard Greenberg did, in fact, spend the day at Royal in Pennsauken. He talked to Rubin and Berman both separately and together. He collected information on Rubin's and Berman's backgrounds, and Rubin showed him around the Royal plant where Greenberg was impressed with the efficiency and orderliness of the packaging and shipping operation as well as the general design of the pool models. He noticed an apparently obvious discrepancy between the large amount of stock on some pool parts and the relatively small amount on others, and this observation triggered a discussion between Rubin and Greenberg on the problem of Royal's inventory imbalance. Tr. at 20:2510. Rubin and Berman discussed with Greenberg their increasing difficulty in getting parts because of lack of capital, and Rubin told Greenberg that in addition to any purchase price which Coleco paid for Royal it would have to pay out a substantial amount almost immediately to pay suppliers. Tr. at 20:2514. Berman told Greenberg that the

crux of Royal's problem was that although the orders were coming in, Royal lacked the capital necessary to start a strong flow of pools from Royal to fill the orders. Tr. at 28:3625–26. Greenberg asked if Royal could produce and sell 2500 pools in 1973. Rubin said such production would be possible with a substantial infusion of capital,[10] operating two 10-hour shifts six days a week, and if Coleco provided Royal with production foremen. Tr. at 20:2514–15. Greenberg said money and personnel would be available and suggested further that Coleco could ease Royal's burden by providing Royal with certain Coleco-manufactured pool parts and with trucking services. Tr. at 20:2515–16. He also pointed out that should Coleco acquire Royal, suppliers would not press as hard for payment, because of the Coleco name. Tr. at 20:2515. Rubin told Greenberg that he believed Royal to be making an average $500 gross profit on each pool sale which would result in $4 million total sales for 2500 pools and a gross profit of $1,250,000. See Ex. U–14 at 4. There was also discussion among the three men of Royal's inroads and potential inroads on the dealer/customers of Abco Swimming Pool Co., a subsidiary of Coleco. Greenberg pointed out that one advantage of the acquisition would be the elimination of competition between Abco and Royal. Tr. at 20:2507. Greenberg testified on cross-examination that on April 18, 1973, he was aware that Abco and Royal shared some of the same customers and that Royal was courting one of Abco's larger customers. Tr. at 8:872–73. Finally, Greenberg told Rubin and Berman that Coleco wanted to acquire Royal because

It would be an extension of the swimming pool—their participation in the swimming pool field on a high quality pool which they had not made before and he said that they had the choice of either designing it themselves from scratch or buying someone that was in the industry and it looked like we had been .doing fairly well.

---

10. Berman and Rubin both testified that Rubin told Greenberg that in order for Royal to produce 2500 pools in 1973, Coleco would have to invest $200,000 immediately and up to $500,000 within a few months to pay suppliers. Tr. at 20:2515 & 28:3629.

He mentioned that he had been impressed the first—back in San Antonio a year ago with Abe's presentation of the booth and he watched us in the year in between and it looked like that we had done rather well for our limited capital, which was generally pretty well known in the field. . . .

Tr. at 20:2511. The three men then discussed a purchase price of approximately $1 million (Tr. at 20:2512), and Greenberg conditioned his tentative offer on Royal's allowing Coleco personnel to visit Royal and examine its books and records. Tr. at 20:2513.

The substance of this April 18th meeting is corroborated by exhibit U-14, a memorandum, dated April 20, 1973, from Leonard Greenberg to Arnold Greenberg and Mel Gershman; the two Greenbergs and Gershman formed Coleco's executive committee. Some of the more salient portions of the memorandum document Coleco's motivation, as expressed by its then president, in acquiring Royal and Coleco's recognition that the acquisition was a speculative one. Greenberg begins the memo:

Remembering, of course, that this company has yet to make a profit, the question really gets down to what management capability are we buying, and how is this evidenced by their product line, and what would it take for us to duplicate this type of product line and sell it.

He also suggests that Coleco could, upon acquisition, raise the price of each Royal pool about $200 since "they [Rubin and Berman] entered the market a little nervous this year, and let their pants down with regard to prices." Near the end of the memo Greenberg states, in discussing a purchase price,

At this point I'm holding out for a million dollars and I have a hunch that they would be willing to sell for a million, and

I stress, of course, in these notes, that they have still to show their first profit. Everything is conjecture.

In addition to Leonard Greenberg's April 20th memorandum, the record contains a memo, dated April 19, 1973, from Gershman to the Greenbergs. This memo (Ex. U-304) contains information which Gershman had collected at Leonard Greenberg's request in order to verify Royal's reputation and status in the swimming pool industry. Through discussions with the principals at Esther Williams Swimming Pool Co., Gershman did indeed verify that Royal was "undercapitalized and, therefore, couldn't really move in the marketplace because it takes so much money to build the inventory and carry the accounts" but that Hank Greenberg of Esther Williams (no relation to Leonard and Arnold Greenberg) said

that Royal pool was coming up very strong, with apparently a good product copied after Esther Williams, and was in his second year. He indicated that both Berman and Rubin seemed to know what they were doing and that because of their limited finances he had to work carefully with them but indicated an estimated sale of 2500 filters this season.

Gershman also notes the "drastic material costs increases" in the pool industry in 1973 and that aluminum prices, in particular, were "increasing very rapidly." [11]

Before moving on in our narrative of the events of April and May 1973, we note that plaintiff at trial and in its brief made much of two letters (Exs. 33 & 37),[12] dated April 17, 1973, and written by Joe Rubin to his two major suppliers of aluminum extrusions, Howmet Corp. and Capital Products, Corp. Rubin admits that he did not mention these letters to Leonard Greenberg during their April 18th meeting. Based on this omission, plaintiff contends that Rubin deliberately concealed from Greenberg the

---

11. Gershman testified in deposition, parts of which were read into the record at trial, that, as Coleco's overseer of purchasing, he was in a position to follow price fluctuation in the supplies market. Tr. at 19:2307.

12. Both exhibits were admitted as to defendants Rubin and Berman; we took under advisement the objection of the Cohen defendants that the letters, relevant only to the 10b–5 claim, were irrelevant as to them since we had already directed a verdict in their favor on the 10b–5 claim. We now sustain their objection.

facts to which Rubin attests in the letters. In both letters, but especially in the letter to Howmet, Rubin invokes the imminency of Armageddon if both suppliers do not deliver as promised. He mentions various "disasters" and "catastrophes," including lost customers, damaged reputation, and threatened law suits, all resulting in no small part from the dereliction of Howmet and Capital. Rubin explains these letters and his failure to show them to Greenberg as attributable to the inflated rhetoric and factual exaggeration necessary in "a business letter that was sent out trying to shake them up into manufacturing parts for us correctly." Tr. at 24:3057. We accept Rubin's explanation and find that on April 18, 1973, Rubin and Berman represented to Leonard Greenberg the condition of Royal as they believed it to be.

On April 21, 1973, the Greenbergs and Gershman met among themselves in Hartford to discuss the details of a possible acquisition of Royal. Although they were aware that Rubin and Berman wanted to effect any acquisition as rapidly as possible because of Royal's need for working capital, the Coleco principals, especially Arnold Greenberg, wanted a full audit as of June 30, 1973, to verify the $500 per pool gross profit figure Rubin had given to Leonard Greenberg. Tr. at 2B:26–28. This, in Arnold Greenberg's estimation, would delay closing until August 1973. Tr. at 2B:30. Should this take place, however, the Greenbergs and Gershman agreed they would pay $1 million for Royal over a three-year, payout period. Tr. at 2B:30.

One week later, April 28, 1973, Rubin and Berman came to Hartford and met there with Arnold and Leonard Greenberg, Mel Gershman, Michael Schwefel, Coleco's general counsel, James Hubert, Coleco's corporate controller, and Edward Fialkowsky, Coleco's treasurer. The meeting was a lengthy one beginning with a discussion of Rubin's and Berman's backgrounds and the nature and status of the Royal operation. Although Rubin and Berman were enthusiastic about Royal's potential, they told the group at the meeting, as they had told Leonard Greenberg on April 18th, that Royal had to have an immediate infusion of several hundred thousand dollars of working capital for suppliers.[13] Tr. at 21:2527–28. The conversation also covered the availability of Coleco foremen, pool parts, and trucking (Tr. at 21:2532 & 2535–36), as well as joint Abco/Royal customers and customers that Royal would bring to Coleco. Tr. at 21:2529. Rubin discussed the problems he was having with his newest pool model, the Castle. He told the Coleco representatives that he was having technical problems with the aluminum extruders because of their difficulty in executing his designs and that he had no final costing figures on the Castle. Tr. at 21:2531. He also told them that because of difficulties with suppliers he was shipping pools to dealers short parts when the dealers were willing to accept incomplete pools temporarily and wait for missing parts. Tr. at 22:2708–11. The Coleco representatives then told Rubin and Berman that before closing they wanted a June 30, 1973, audit. Rubin and Berman responded that Royal could not wait that long for relief. This seeming impasse was resolved when the parties tentatively agreed that the non-contingent $1 million purchase price originally contemplated would be reduced to $500,000 with another $500,000 contingent upon the profitability of Royal over a three-year pe-

---

13. Rubin's and Berman's testimony that they talked, in the early discussions with Coleco, about Royal's need for an immediate few hundred thousand dollars for suppliers and up to $500,000 within a month or so appears corroborated by exhibit U–302, notes taken by Arnold Greenberg during the April 28th meeting in Hartford. The exhibit shows the following notation:

Suppliers: 300,000 now
 will go to 400–500,000—by end of May

Although Arnold Greenberg testified that these figures represented Royal's total indebtedness to suppliers (Tr. at 3:166), the congruence between Greenberg's figures and the ones testified to by Berman and Rubin coupled with the presence in Greenberg's notes of the word "now" underscored persuades us that Greenberg was recording statements by Rubin and Berman that Royal would need several hundred thousand dollars by June to pay suppliers.

riod. As Arnold Greenberg put it: "In other words, if we were to be persuaded to go forward without a June 30 audit, they ought to wait for their money." Tr. at 2B:58. The parties also agreed that the Royal shareholders would warrant Royal's financial and operational status in the purchase agreement and that Royal's accountant, Zelnick, Sobelman, & Co., would prepare an unaudited April 30, 1973, financial statement also to be warranted in the Purchase Agreement. Finally, since Berman was reluctant to open fully his customer files to Coleco without some assurance that the acquisition was being seriously considered, the parties agreed that Coleco would provide Royal with a letter of intent to purchase, and plans were then made to send a team from Coleco to Royal

> to take a look around, to get some comfort, to take a look at certain books and records to see if they backed up the recommendations we heard.

Tr. at 2B:77 (Arnold Greenberg).

The examining team, consisting of Schwefel, Hubert, and Gerald Glassman, Coleco's then director of costing,[14] subsequently visited Royal on May 2, 1973. Schwefel, who brought with him the letter of intent, spent a good deal of time with Berman going over the status of Royal's individual dealer/customers. Tr. at 21:2599 and 28:3642–45. Berman told Schwefel about Royal's practice of giving customers so-called "protected territories," that is, making informal, usually oral agreements that Royal would not sell pools to other dealers in a certain geographical area. Berman considered these agreements a common practice in the swimming pool industry, terminable at will, and without any legal force. Tr. at 28:3616–18. Schwefel told Berman he was familiar with the concept of "protected territories" through Abco, Coleco's subsidiary, which also engaged in the practice. Tr. at 29:3738–40. Berman also discussed with Schwefel special problems with Regency, Carib, and Style, all pool companies.[15] Tr. at 28:3643–47. In addition Schwefel sat in on a discussion between Berman and Royal's attorneys concerning litigation with Carib Pool Co. in which Royal was involved and went over the Royal shareholder and bank loan agreements. He asked to see customer service files, and Rubin told him that no files existed since service complaints were minor, usually having to do with faulty liners and were dealt with informally.[16] Tr. at 4:304–

14. Although Glassman is no longer in the employ of Coleco, we consider his deposition testimony, read into the trial record, to be crucial for a few reasons. First, he was, both during 1973 and at the time of his deposition, plaintiff's own man, one of its higher ranking management employees. Tr. at 3:242. Second, as Coleco's director of costing, he was its expert in the area in which Coleco claims perhaps the most serious breach of the Purchase Agreement. We also note that despite Glassman's significant role in pre-acquisition activity, plaintiff did not call him as a witness.

15. Regency was an apparently abortive enterprise Rubin and Berman launched in 1972 to distribute Royal pools in Canada. Tr. at 28:3643. Regency was to be operated in Canada by a Mr. Gascoigne and a Mr. Mitchell who were to receive a commission on each Royal pool sold in Canada whether or not they sold it. Tr. at 27:3529–30. Rubin showed the contract with Gascoigne and Mitchell to Schwefel, and Regency was discussed with Schwefel on more than one occasion. Tr. at 27:3531–32.
Carib was the pool company involved in litigation with Royal in the Spring of 1973. The lawsuit was settled in May 1973.

Style Pool Company was one of Royal's 1972 dealer/customers in Chicago. Style had purchased about 25% of Royal's production in 1972, but Rubin and Berman had had a great deal of difficulty in collecting their money from Style, nearly $100,000 owing to Royal near the end of 1972. In order for Royal to collect its money, Rubin and Berman were pressured into entering into a written agreement with Style in October 1972 giving it an exclusive distributorship. When they finally collected all money owing from Style, they notified Style that Royal would no longer deal with it. All this information was revealed to Schwefel on May 2, 1973. Tr. at 28:3644–47.

16. We have not overlooked exhibit U–77, a letter from Style to Coleco dated June 6, 1973, and exhibit P–82, a memorandum from Tony Gaeta to Abe Berman dated June 18, 1973, in finding that Royal had had no major customer complaints prior to June 4, 1973, and that whatever complaints it had received were handled informally. Both U–77 and P–82 are, of course, dated post June 4, 1973. As to the substance of the problems cited in U–77 and P–82 and relevant to the inferences one might draw regarding the kinds and number of cus-

5. Hubert spent his time with two of Royal's accountants, Norman Zelnick and Steven Savett, going over their work papers for a January 31, 1973, financial statement they had prepared for Royal.[17] Based on information given to him, Hubert then prepared an estimate of Royal's profits for 1973. Glassman spent his time either with Rubin or alone going over invoice files and a cost sheet and bills of material on the different pool models made available to him.[18] Glassman toured the factory with Rubin and noted that the Royal inventory was "very much out of balance," (Tr. at 19:2255) and he and Rubin discussed the problem. Rubin then showed him the cost sheet [19] on the 15 by 30 foot Crest pool, Royal's largest seller for 1972. Eventually, Glassman found that $70 worth of materials had been left off this cost sheet.[20] Tr. at 19:2259 and 2283. Although Rubin did not show him cost sheets on other pools, he showed him the bills of material [21] for several other pools but not the Castle and Camelot models, and Glassman found the same items missing on these bills of material as he had found on the Crest cost sheet. Tr. at 19:2267. Rubin and Glassman also discussed the fact that Royal's cost sheets had not been updated from 1972 and that

aluminum prices were rising. Tr. at 19:2284. Rubin estimated the price rise would affect the price of a pool by $50. Tr. at 19:2284. Finally, near the end of the day, Rubin discussed with Schwefel, Hubert, and Glassman together the problems caused by inventory imbalance, particularly the problem of shipping out Castle pools with heavier and more expensive Crown and Crest parts substituting for the missing Castle parts. Tr. at 21:2567–68. After this meeting at Royal, Glassman discussed his findings at Royal with Hubert and Schwefel. He summarized those discussions this way:

> Only to the effect that I was satisfied that the items listed on the Bills of Material or the Bill of Material, if you will, were costed properly according to invoices, but that I did have a concern that perhaps there might be other items that I didn't find inasmuch as I had found some $70 of items already just by probing that were not contained on the Bill of Materials.

Tr. at 19:2283. Back at Coleco, Glassman told Mr. Gershman about the discrepancies he had found:

> I informed him of the missing items on the Bill of Materials. I told him that I

---

tomer complaints Royal might have received prior to acquisition, we note first that complaints from Style to Coleco are suspect given the difficulties it had created for Royal in 1972. Rubin believed Style to be capable of commercial blackmail, and, although Style no longer dealt directly with Royal, it was still a customer of Coleco's. Second, while Gaeta's assertions in P–82 are not suspect, most of the complaints he lists go not to the quality of the Royal pools but to Royal's failure to deliver promptly on the orders it took. This, of course, is the problem, revealed to Coleco prior to acquisition, that prompted defendants' decision to sell Royal. Gaeta also mentions the related problem, also revealed to plaintiff prior to acquisition, of Royal's shipping incomplete pools to dealers who were willing to accept them that way temporarily. Finally, Gaeta cites complaints for faulty liners and Royal's failure to deliver a pool feature called "Roman Steps." Rubin told Schwefel prior to acquisition that most of the complaints he had received had to do with faulty liners. As for the missing "Roman Steps," whatever the explanation for the problem to which Gaeta refers, his memorandum reference does not move us to change our

finding that Rubin spoke the truth when he told Schwefel that he kept no formal customer complaint files and that he dealt with occasional minor complaints on an ad hoc basis.

17. Hubert found a $16,000 error in the statement which was corrected in the April 30, 1973, statement. Tr. at 10:1107–09.

18. Glassman's account of his visit to Royal on May 2, 1973, and Rubin's account of the same visit are highly corroborative.

19. A cost sheet consists of a listing of the various parts comprising a given pool model along with the prices of the parts.

20. Hubert testified that after Glassman informed him of the $70 discrepancy, he ascertained from Rubin that $20 of the $70, the cost of a crate, was accounted for since it was included in factory expenses rather than in the cost of the pool. Tr. at 10:1112.

21. A bill of material differs from a cost sheet in that it omits prices.

had been satisfied that the pricing that had been listed on the costed Bill of Materials appeared to be correct, and I expressed a concern about perhaps some other items that I didn't find listed that perhaps might also be missing from the costing.

Tr. at 19:2294. Glassman and Gershman discussed Royal's inventory imbalance. Tr. at 19:2300–01. Glassman also reported his May 2nd findings directly to Arnold Greenberg.[22] Tr. at 19:2296. Stangely enough, although Schwefel visited Royal again and Hubert twice more prior to acquisition, Glassman was not again instructed to concern himself with Royal until September 1973. Tr. at 19:2296–97.

Sometime after May 2, 1973, Schwefel called Royal to say that Coleco was willing to go ahead with the acquisition and that he was sending to New Jersey a copy of a draft agreement. The upshot of this call was the next meeting between Royal and Coleco in Hartford on May 14, 1973. This time, however, Rubin and Berman met only with Schwefel and Hubert, Arnold Greenberg coming into the room only a few times to engage in a quick exchange and then leave. Beginning a pattern of practice followed by Coleco through the critical Summer of 1973, Schwefel conducted the direct communications between Rubin and Berman and Coleco. The parties once again discussed joint Abco/Royal customers (Tr. at 24:3094), Royal's need for a large infusion of capital (Tr. at 21:2618), its inventory imbalance (Tr. at 21:2618), and its special relationships and problems with Regency, Style, Carib, and Apex pool companies (Tr. at 21:2602–03).[23] Berman and Rubin were

unhappy about unilateral changes they felt Coleco had made from their original understanding to the draft agreement and were offended by the Greenbergs' seeming refusal to deal with them directly. Before leaving Hartford, however, Rubin did telex banks and certain of Royal's suppliers authorizing them to release to Coleco's representatives financial information they had on Royal. Tr. at 21:2618–19. In addition, before they left, Arnold Greenberg stopped in the meeting room to say that the litigation with Carib pools must be resolved before closing. Tr. at 21:2623. Within several days after this May 14th meeting, Schwefel called Royal to inquire into the status of the acquisition, and Rubin and Berman told him that they had decided against going ahead because of the discourteous treatment they had received in Hartford on May 14th. This announcement precipitated a phone discussion between the Greenbergs in Hartford and Rubin and Berman in Pennsauken during which agreement was again reached. Thereafter, Hubert visited Royal twice more on May 25, and June 1, 1973, to work with Royal's accountants on the April 30, 1973, statement which was to be warranted as part of the Purchase Agreement, and reported back to Hartford. Although Hubert had, over his several visits to Royal, discovered more than one error made by Zelnick, Sobelman, and Co., he missed two others that defendants concede render the April 30, 1973, statement erroneous in the amount of $49,922.88.[24] At last, on June 4, 1973, the Carib litigation having been settled, the acquisition was effected and closing took place in Pennsauken and Philadelphia. The Royal shareholders received $135,000 plus interest as the first of three

---

**22.** Greenberg does not dispute that Glassman reported to him; he testified only that he has no recollection of such a report. Tr. at 3:249.

**23.** Apex was a New England pool company connected with Carib pools. Berman considered Apex to be Carib's dealer and that any exclusivity afforded Apex came though Royal's relationship with Carib. As Berman put it, "Carib had an exclusive and Apex had an exclusive with Carib and I honored that and let Apex know about that." Tr. at 29:3746. The Apex situation was discussed with Schwefel

more than once. Tr. at 21:2605–07 and 28:3664. On May 14, 1973, in Hartford, when Berman explained Royal's relationship to Apex to Schwefel, he told Rubin and Berman that, in his opinion, Apex was Carib's dealer and not Royal's. Tr. at 21:2606.

**24.** Post-trial brief of the Cohen defendants at 2. Zelnick, Sobelman, & Co. admits these errors were accountants' errors. Tr. at 31:4072–76 and 4085.

non-contingent payments, and Coleco took Royal.

To summarize, then, and to make explicit our assessment of the character of Rubin's and Berman's negotiations with Coleco which culminated in the June 1973 acquisition of Royal by Coleco, we find that during the whole of the pre-acquisition negotiations, both Rubin and Berman were forthright in their dealings with the principals and representatives of Coleco and did not deliberately misrepresent any aspect of Royal's status or operation. Any factual misrepresentation made through the vehicle of the warranties in the Purchase Agreement, especially through the warranty of the April 30, 1973, financial statement, was not studied.

### C. *June 4, 1973 Through November 1973.*

Immediately upon closing and continually thereafter Berman, and especially Rubin, applied to Coleco, through Michael Schwefel, for the heavy infusion of capital to suppliers they had been led to expect would be forthcoming. Tr. at 21:2657–67. It simply never came. In June Coleco advanced $155,000, in July $45,000, and in August $9,000 to pay suppliers. Tr. at 3:226. The *continuing shortage of working capital* had three immediate effects. It left suppliers unsatisfied so that they withheld materials from Royal.[25] Tr. at 21:2659–70 and 28:3673–74. This, in turn, precluded Royal from delivering on its orders and from balancing its inventory. *Id.* Finally, it made Royal's accounts receivable difficult to collect for reasons on which Berman and Anthony Gaeta, a Royal salesman, agreed. Tr. at 28:3674–75 and 30:3844–45. As Gaeta explained the problem:

> The reason I was having a problem is that at that time of year, the manufacturer is in a very critical position. The dealer has sold his pool. If he does not receive delivery, the customer is going to cancel, so the dealer will go somewhere else. In order for the dealer to go somewhere else at that time of the season, he had to pay cash or certified before delivery so he would hold up the monies that he owed me to pay another manufacturer.

Tr. at 30:3844–45. This situation left Rubin contending daily with suppliers to obtain what parts he could (Tr. at 21:2673) and Berman contending daily with dealer/customers on whose previously obtained orders he could not deliver. Tr. at 21:2668–69. Nor did Rubin ever get any Coleco personnel to help him in the factory, and for seven weeks during the summer of 1973 he worked seven days a week, 13 and 14 hours a day. Tr. at 22:2698 and 2702. Moreover Berman and Rubin were relegated to dealing with Schwefel, Coleco's general counsel, in trying to work out Royal's operational problems. Schwefel told Rubin to deal through him (Tr. at 21:2646–47), and, when Rubin attempted to contact directly Mel Gershman, Coleco's overseer of purchasing, he was unsuccessful. Tr. at 21:2666.

Aside from preventing Royal from producing the number of pools Coleco wanted it to produce, the frustrating state of affairs in Pennsauken had a second debilitating effect. Berman and Rubin were fast alienating each other. Berman obtained many more orders than Rubin could fill so Berman was constantly importuning Rubin for more finished pools. Rubin, in turn, without the foremen Coleco had promised and instructed by Schwefel to use Berman in the factory (Tr. at 22:2698), attempted to draft Berman into production. At this Berman balked saying to Rubin:

> What am I going to do out there? I don't know how to drive a fork lift. I don't

---

**25.** The situation with suppliers was exacerbated because, just prior to closing, Rubin had released to suppliers news of the acquisition and had thereby raised their expectations of payment, as the Greenbergs had predicated. Tr. at 21:2657–58. When payment was not forthcoming, suppliers took a hard line toward Royal. Rubin told Hubert:

> We have no answer for suppliers. Coleco came on like a big company and said they were going to pay everyone and the suppliers want money and now they refuse to give us anything.

Tr. at 21:2665.

know how to pack a pool. I wouldn't know if parts were short and what parts weren't short. I am a salesman. I am selling pools. I've got the pools sold and now it is up to you to ship them.

Tr. at 26:3442. Berman also left the office work and supervision of the office workers to Rubin. Tr. at 26:3428, Ex. R–35. For instance, in a letter to his counsel that Rubin wrote in September 1973, he made the following statement which we credit:

Berman never Credited dealers on returns. He never Debited suppliers on returns. Generally the office work was a disaster. . . .

Ex. R–35 at 4 (admitted without objection). By July Rubin was keeping a diary of Berman's comings and goings and reporting them to Coleco (Ex. 18). Berman told Rubin that "he will do what he wants and let Coleco fire him then he will sue." Ex. 18, Tr. at 26:3439. This statement was part of the information that Rubin relayed to Coleco. Tr. at 26:3439. In addition, Rubin testified at trial that Berman spent less and less time at Royal in July but that he didn't know whether Berman spent his time away from Royal on personal matters or on Royal's business. Tr. at 26:3429. According to Berman and Gaeta, whose testimony we accept, the bulk of the time away from Royal was spent on telephones with and at the premises of dealers/customers trying to placate those whose orders were overdue. Tr. at 22:3689–92 and 30:3845–46. Also in July Coleco made known to Rubin and Berman that it was considering adding Al Katz to Royal's sales staff. Berman objected strongly, first, because he disapproved of Katz's sales techniques, and, second, because he felt that Royal, heavy on orders and light on production, needed no addition to its sales staff. Tr. at 28:3679–80–81. In spite of Berman's strong objections, Leonard Greenberg announced to Berman at a meeting in Hartford on July 14, 1973, that Coleco had hired Al Katz as Royal's sales manager. At the same meeting Berman presented a 1974 sales projection considered unrealistic by the Coleco personnel and by Rubin, whose opinion we accept. Tr. at 26:3434–36. Shortly thereafter Schwefel instructed Rubin to inform Berman that he was no longer President of Royal, and Rubin transmitted the message. Tr. at 28:3698–99. Next, Coleco informed Berman he would no longer have authority to sign checks for Royal. Tr. at 28:3700. Then sometime at the end of July or the beginning of August, Rubin told Berman that Leonard Greenberg had requested Rubin to keep a log on Berman and to tell Berman he was doing so. Tr. at 27:3466 and 28:3704. At this point Berman left Royal and was gone a few weeks. He described his reaction when Rubin told him about the log this way:

The fact that the money—we didn't have the money to buy materials, that we couldn't supply pools, that they took the presidency away from me, that they took the check signing authority away, the way I was treated up in Hartford, this [Rubin's telling him about the log] was more or less the straw that broke the camel's back. I just felt my heart palpitating, my stomach turning over and my face turning red, and I said to Joe, "Joe, I'm sorry; because of what's going on here, I must get out of here."

I left and sat down with my wife and told her what happened and she immediately called the doctor and we went over to see him and as a result of this I called Joe and told him that I must have time off, I did go to see a doctor; I must have time off. Otherwise, it is going to result in a nervous breakdown and that I was going away to the seashore for a few days; that I will be in touch with him and as soon as I am able to return, I certainly will, which should be approximately two weeks.

Tr. at 28:3705–06. During the time Berman was away from Royal, he missed an executive meeting in Hartford which he was supposed to attend. Shortly after he returned Arnold Greenberg informed him by phone that he was discharged. Coleco also notified him formally by letter (Ex. 146).

Meanwhile Royal was struggling through the Summer with suppliers dunning them

for payment and dealers clamoring for pools. An inventory was taken [26] at the end of July, badly taken according to Rubin (Tr. at 22:2732–36) whose opinion we credit, and Coleco personnel contended that based on the figures Royal had given them at closing, they had come up short. At approximately the same time as the taking of the inventory Gershman issued a memorandum (Ex. R–49) cancelling all orders with suppliers and authorizing new purchase orders only for materials "to balance off and complete 320 pools." According to Rubin's testimony, which we credit, this directive increased the chaos at Royal:

> With regard to paragraph 3, I asked, "What model 320 pools are we supposed to build?" With regard to paragraph 2, I asked, "Why are we cancelling orders that were placed in an effort to balance out the inventory and then issue new orders for 320 pools that I didn't know what models they were referring to?" It just didn't seem to make any sense. . .
>
> In some cases, it didn't make any difference because vendors had refused to ship us for lack of payment, so cancelling was a futile gesture and in other cases when we cancelled it threw out of balance what we were trying to balance out.

Tr. at 22:2730–31. Yet, in spite of the results of the inventory and the directive from Gershman, on August 16, 1973, Leonard Greenberg wrote to Rubin after an August 13th meeting in Hartford:

> Let's all put our shoulders to the marketing wheel now. I think we know what we have to do for next year, and I think we have an excellent opportunity to grow successfully.

Exhibit U–83 at 4. Also in August Royal received a handful of complaints (less than 10) that Castle pools had pulled apart or "blown" in the field. As a result Rubin designed a "retrofit kit" (Tr. at 22:2760), an

assembly to be added to the structure of the pool to prevent any further problems.

In September Abco, Coleco's subsidiary pool company, began to take over the Royal sales functions. The situation with suppliers was as bad or worse than ever. Rubin told Schwefel and Hubert "that they will not open for business in 1974 unless they pay suppliers." Tr. at 22:2772. A letter dated September 25, 1973, from Rubin to Leonard Greenberg (Ex. U–94) records Rubin's assessment of Royal's problems with its accounts payable. After noting that relations with Howmet were excellent, that Howmet was willing to wait for its money, and that he did not intend to deal with Capital, Rubin went on to say:

> On the balance of suppliers we are having major problems. These are small operators that require money immediately. I have not been able to find anyone at Coleco that will give me a clear financial picture at this time and it has placed me and Royal in a very poor position as far as negotiating with these suppliers. I had hoped that when I sent my Aug. 27th letter to Ed Fialkowsky that the picture would clarify itself since it covered in total, our fourth quarter budget plus cash flow plus receivables plus expenses. However, neither Hubert nor Fialkowsky have at this point been able to give me information as to when monies would be available. I have been told on an unofficial basis that everyone would be paid by Dec. 15th, but this was not definitive enough for me to clearly negotiate with the suppliers. As a result, our credibility factor has been questioned and probably some of the suppliers will not be willing to do business with us next year. If the target date is Dec. 15th and I definitely know about it, at least I know where and how to act. However some monies must be paid prior to that date as some suppliers absolutely cannot wait.[27]

---

**26.** The taking of the inventory produced added difficulty between Rubin and Berman. Rubin tried to involve Berman in the inventory. Berman at first demurred on the ground that he must deal with anxious customers and then, on the next day at Schwefel's or Hubert's request, lent some assistance.

**27.** Exhibit R–6, a portion of which was admitted in evidence over objection (Tr. at 22:2780–84), offers some corroboration for Rubin's

Exhibit U–94. He received no response from Coleco to his letter. Tr. at 22:2779. In September the communications lines between Rubin and Coleco remained down. Tr. at 22:2785. On September 27, 1973, however, Rubin attended a meeting in Hartford with the Greenbergs, Gershman, and Schwefel. During the course of the meeting, Leonard Greenberg told Rubin that the manufacturing of Royal's above-ground models was to be moved to West Haven, Connecticut. Tr. at 22:2797. Since most models of Royal pools were above-ground models, such a change would, in Rubin's words, render the Pennsauken facility a "hollow operation." Tr. at 22:2798. When the Coleco men asked Rubin if he wanted to move to West Haven, he responded negatively and invoked the clause in his employment contract which stipulated that Royal's operation would not be moved more than 30 miles absent an agreement of the parties. Tr. at 22:2798. He then asked what would comprise his duties at Royal in New Jersey after the move but received no answer before the meeting adjourned. Tr. at 22:2798. Just before adjourning Arnold Greenberg told Rubin that Coleco was "going [to go] after the Cohens . . . and Abe Berman" if necessary by a lawsuit. Tr. at 22:2799. He told Rubin he was satisfied with his work and would like to retain and protect him; Greenberg asked Rubin if he would testify for Coleco in a lawsuit. Tr. at 22:2800. Rubin responded that he would simply testify to the truth. Tr. at 22:2800. Back in Pennsauken, Royal employees were being given their working instructions directly by Coleco representatives, a method of operation that bypassed Rubin. Tr. at 22:2810.

In October Rubin received a memorandum, dated October 17, 1973, from Gershman (Ex. R–135) in which Gershman informed Rubin that he was to complete packaging the 150–200 pools for which he had parts on hand. Gershman went on to say:

We would suggest that you, Joe, then personally sell off these Royal pools so that Abco will not get involved in cleaning up the pools from your stock.

Following receipt of this memorandum Rubin procured an order from a pool dealer, Eugene Margolis, for 300–400 Castle pools. Tr. at 22:2820. When Rubin notified Coleco of the sale, however, Schwefel told him not to contact Margolis again, and Hubert later told him Coleco never sold the pools to Margolis. Tr. at 22:2821. Sometime in November Rubin came upon an advertisement in a trade journal (Ex. R–152) that, for the first time, informed him of the use to which Coleco was putting the Royal name and reputation. The advertisement is headed:

This year ABCO is also ROYAL
the Famous Line of
ALL ALUMINUM SWIMMING POOLS

A portion of the text of the advertisement states:

Royal pools have always had a great concept. Now, this outstanding line will have Coleco for manufacturing and inventory control and ABCO's management and distribution experience . . . an outstanding combination. ·

The company name is printed as "ABCO/ROYAL (a subsidiary of Coleco Industries, Inc.)," and the pools pictured in the advertisement are called the Crest, the

---

statement to Leonard Greenberg. In exhibit R–6, a September 6, 1973, letter to Rubin, the president of Jard Engineering Co., one of Royal's suppliers, wrote:

Like all our other customers, we value the Royal account, but upon a closer examination, we find that even though your account represents a large dollar volume, it has not been profitable for one apparent reason. During the month of August alone, we paid $774.05 in interest charges to borrow money to equal the amount that Royal currently owes us.

. . . . .

In as much as Jard is not a large company, we can not afford to continue to finance Royal or Coleco. We, therefore, have no alternative but to charge a 1½% per month service charge for all invoices over thirty (30) days old.

As of the writing of this letter Royal owed Jard $62,943.01, of which $51,088.25 was owing more than thirty days. Although plaintiff raised hearsay objections to exhibit R–6, plaintiff does not contend that the facts represented by Jard are inaccurate. Tr. at 22:2782.

Jewel, and the Crown. Up to the time he saw the advertisement, Rubin was unaware of any connection between Royal and Abco except for Abco's acting as Royal's sales department; nor was he informed that the Royal Crest and Crown names were to be appended to Coleco's apparently newly-designed versions of above-ground aluminum pools.[28] Tr. at 22:2823–29.

By November 1973, then, Rubin found his professional situation totally unworkable. His relationship with Coleco personnel was "absolutely terrible;" "there was not even a pretense on their part of attempting to work with me." Tr. at 22:2830. Rubin had one last meeting with Arnold Greenberg, who reassured him that any slights or failure to transmit information was inadvertent on Coleco's part; he also asked Rubin to meet him at a trade show in New York near the end of November. Tr. at 22:2834–35. Rubin went to the show but never saw Greenberg. Tr. at 22:2836. He then came back to New Jersey and typed and mailed his resignation. (Ex. R–154).

Having concluded our chronological factual findings, we now come to the question of what happened to Royal All-Aluminum Swimming Pool Corp. during the Summer and Fall of 1973. According to plaintiff, Royal was doomed to failure before it purchased the company; the misrepresentation of Royal's financial status, the presence of exclusive dealerships, and the defective design of the Castle pool, all of which constituted breaches of the Purchase Agreement, precluded profitability, destroyed Royal's reputation and customer goodwill, and drove away customers. We simply cannot accept this contention. Assuming, for the moment, the breaches of the Purchase Agreement, which plaintiff alleges, we note, that with the exception of a breach of the financial warranty, Coleco offered no persuasive proof of money damages flowing from the existence of exclusive dealerships or from the problems with the Castle pool in August 1973. Neither did plaintiff prove loss of customers or reputation resulting from these breaches. In fact, in view of Coleco's obvious attempt to use the Royal name in trade journal advertising for the 1974 pool season to attract customers for Abco (Ex. R–152), it defies logic to find that Coleco believed Royal's reputation to be in ashes. Plaintiff in its post-trial brief states that what it was bargaining for in acquiring Royal was "a *potentially* profitable company producing and marketing a high quality product, with an established clientele and goodwill and having experienced and qualified executives to manage day-to-day operations." Plaintiff's post-trial brief at 113 (emphasis added). This, we find, is substantially what Coleco got. Royal failed, we find it much more probable than not, because Coleco mismanaged it after the acquisition.

To begin, it becomes clear, in retrospect, that Coleco did not invest in Royal the amount of working capital necessary to start the free flow of material that would have thrown Royal into high gear. This probably resulted from lack of planning on

---

28. On direct examination Rubin testified that the Abco/Royal Crown and Crest were constructed of sheet aluminum ˋrather than the extruded aluminum used in Rubin's designs. Tr. at 22:2827. His answers to questions also implied that he believed the new Crown and Crest to be redesigns of the old Crown and Crest. Tr. at 22:2828–29. On cross-examination Rubin further testified that the technical design and construction of the new Crown and Crest appeared different from that of the old ones. Tr. at 27:3594–97. When counsel for plaintiff attempted to elicit Rubin's agreement that there was no redesign involved, Rubin answered:

It may be partially correct or incorrect. I don't know. Maybe the fencing is the same.

Certainly the balance of it is not. It was just a partaking of the name.

I can't answer that. I would really have to think considerably, because I think it may be misleading and a play on words, with no disrespect meant.

Tr. at 27:3595. We agree with Rubin that the problem appears semantic. Whether or not Coleco was attempting to bolster Abco's sales through the Royal name, the Royal design, or a combination of the two is not material. The point is that without informing Rubin, Coleco appropriated for Abco what it obviously perceived as Royal strengths.

one hand and miscalculation on the other. Gershman, one of the three Coleco principals and its overseer of purchases, admittedly made no projections or forecasts of the amount of working capital Royal would need in 1973 nor did he instruct anyone on his staff or in the accounting department to do so. Tr. at 19:2329–30. Nor did Gershman do any forecasting for the 1974 pool season. Tr. at 19:2330. In addition to problems caused by lack of planning, it appears likely that Arnold Greenberg's theory on how to handle suppliers backfired. Greenberg explained at trial that

> Our desire was to get as much supplier/company operation, obviously, without putting in—without putting in too much money and I think that was a significant piece of financial assistance. It was our goal to put in as much money as was required to meet the sales needs of Royal
>
> . . . .
>
> A supplier relationship is very often a continuous bit of dialogue, whereby the supplier would like more and the manufacturer of a seasonal product who has great needs and big receivables for part of the year says "yes, I know, but I need another 30 days."
>
> The part of the skill of a good businessman is to negotiate that and ease the need for cash input and yet allow the supplier to live. It is a delicate piece of business. I think we have generally been successful at it.

Tr. at 3:230–31. We do not believe Coleco was successful in the present case. There is also scattered but persuasive evidence in the trial record that Coleco was having financial problems of its own during the summer of 1973 which diverted both Coleco's attention and money away from Royal. In June 1973, after acquisition, when Rubin questioned Schwefel about his reporting to Schwefel instead of directly to the Coleco principals, Schwefel told Rubin:

> Look, don't rock the boat. We have problems up there; we have problems in the

Coleco organization. They are losing a lot of money in Canada. Just stay with it and don't rock the boat.

Tr. at 21:2672. In addition, Schwefel instructed Rubin to include in his report of June pool sales the pool sales from the first two weeks in July so that June, Coleco's quarterly closing, would "look like a big month." Tr. at 21:2677. Rubin complied.[29] Tr. at 21:2679. In September, responding to Rubin's requests for money to pay suppliers, Schwefel and Hubert said that "they were having major financial problems of their own and that they had no money to give us." Tr. at 22:2772. Finally, Arnold Greenberg testified upon cross-examination that Coleco did not show a profit in 1973 "by virtue of discontinuing an operation." Tr. at 3:274.

Furthermore, the Coleco principals, Arnold and Leonard Greenberg and Mel Gershman, apparently preoccupied elsewhere, insulated themselves from direct contact with Royal and especially from direct contact with Rubin, the man closest to Royal's problems. As we noted earlier, strange though it now seems, the Coleco representative to whom Rubin reported and answered was Michael Schwefel, Coleco's attorney, who made no pretense of having any working knowledge of the pool business. Tr. at 4:303. Thus, we will never know whether the decisions to limit supplier payments to a total of $210,000 for the pool season months of June, July and August and not to provide Royal with production foremen to aid Rubin were a product of studied consideration by the Greenbergs and Gershman, of hasty denial, or of the incompleteness or imprecision of the information filtered to them through Schwefel. Coleco's inattention to Royal in Summer and Fall 1973 is also evidenced by its failure to effect the price rise for each pool model obviously contemplated as early as Leonard Greenberg's memorandum of April 20, 1973 (Ex. U–14). Rubin advised Schwefel as early as June 1973 that a price rise was in

---

**29.** Rubin's compliance is corroborated by exhibit R–96, a tally sheet Rubin kept, which shows the total pool sales for the month of June as including the sales for the first two weeks in July.

order to "give us more working capital and at the same time slow down the influx of orders." Tr. at 22:2723. Yet by October 1973 the prices had not been changed. Tr. at 22:2797. The slowness of Coleco's moving to raise prices is even more curious when one recalls the testimony of Gershman and Glassman and Gershman's memorandum of April 19, 1973 (Ex. U–304), which record Coleco's awareness of the rising costs of pool materials, especially of aluminum. Finally, we note that although Arnold and Leonard Greenberg believed in April 1973 that one of Royal's greatest strengths was the two men who ran it, Rubin and Berman, they handled both men badly insisting that Berman, the salesman, work in the factory, and allowing Rubin to work killing hours unaided for weeks. Indeed, both men were gone by the end of 1973.

In summary, we believe that Royal's problems during 1973, which may have rendered it inoperational by 1975, did not result from Royal's inherent weaknesses but from Coleco's mismanagement of what it recognized from the beginning was a speculative venture into a fledgling business. Recall Leonard Greenberg's admonition in his April 20, 1973, memo (Ex. U–14): "Remembering, of course, that this company has yet to make a profit," and his statement in the same memo "Everything is conjecture." Furthermore, putting aside for the moment the reasons why Royal no longer operates, we note that Royal, in spite of its severe problems, broke even for the five-month period ending September 30, 1973 (Tr. at 12:1393), and that Abco, as distributor of Royal pools in 1974 and with its advertising leaning heavily on the Royal name, had a record year. Tr. at 9:990 (L. Greenberg).

---

**30.** At the close of plaintiff's case, we directed a verdict on the 10b–5 claim for the Cohen defendants. Tr. at 18:2069–73.

**31.** In *Thomas*, the Court of Appeals for the Third Circuit holds, however, that in the case

## II

## CONCLUSIONS OF LAW

Again, in the interest of palatability, we will present our conclusions of law in essay form rather than in separately numbered paragraphs. The following discussion, then, comprises our conclusions of law required under Fed.R.Civ.P. 52(a).

A. *Liability of Defendants Rubin and Berman Under Section 10(b) and Rule 10b–5* [30]

To make out a 10b–5 case a plaintiff must prove that defendant made a misrepresentation either through affirmation or omission, with the requisite scienter, of a material fact upon which plaintiff relied. *Thomas v. Duralite Company, Inc.*, 524 F.2d 577 (3d Cir. 1975).[31] Recently in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the United States Supreme Court clarified the concept of scienter in the context of a 10b–5 action by holding that it did not encompass mere negligence. Relying on the language of section 10(b) itself, on the legislative history of the section, and on a comparative analysis of the two major securities acts, the Court stated that "[i]n this opinion the term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 194, 96 S.Ct. at 1381 n. 12. The Court did go on to say:

> In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5.

*Id.* Given the thrust of *Ernst & Ernst*, however, with its emphasis on conscious

of misrepresentation by omission, the burden of proving non-reliance shifts to the defendant because of the difficulty for plaintiff of proving a negative. 524 F.2d at 585.

manipulation and trickery, we feel confident in continuing to apply to the 10b–5 issues in this action the test for scienter which we applied in granting the Cohen defendants' motion for directed verdict before the Supreme Court handed down its decision in *Ernst & Ernst.* Accordingly, we hold that to establish the element of scienter in an action brought under section 10(b) and Rule 10b–5, a party must prove injury resulting from a conscious deception or from a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception.

■ Applying, then, the legal principles articulated in *Thomas v. Duralite Company, Inc.,* and *Ernst & Ernst v. Hochfelder* to the facts of this case, we conclude that plaintiff has not proved that either defendant Rubin or defendant Berman violated section 10(b) and Rule 10b–5. Plaintiff alleges that both defendants violated the federal securities law in that they culpably misrepresented or failed to reveal the following facts during pre-acquisition negotiations:

1. That Royal lost a substantial number of customers from the 1972 to the 1973 selling season.[32]
2. That Royal had received serious complaints from customers.
3. That Royal was a party to territorial or exclusive selling agreements.
4. The status of Royal's relationship with material suppliers.
5. That Royal's inventory was out of balance.

6. That the Castle had not been costed.
7. That Royal was shipping pools to dealers short parts.
8. The status of pending and threatened litigation.
9. The average profit per pool.
10. The quality of the design of the Castle pool.
11. Royal's financial status.

As to numbers one through eight, we conclude that no liability exists because, as we found in Section I of this Opinion, there was no misrepresentation or failure to reveal material facts about Royal relevant to customer history, customer complaints, protected territories, supplier relationships, inventory imbalance, the costing of the Castle pool, the shipping of pools short parts, or pending or threatened litigation. As to numbers nine and ten, we will assume without so finding that defendants Rubin and Berman misrepresented the average profit per pool to be $500 and misrepresented the quality of the design of the Castle pool; as to number 11, we have already found that Royal's financial state was misrepresented through the medium of the April 30, 1973, financial statement. We find no violation of section 10(b) and Rule 10b–5, however, since we believe that any misrepresentation in these areas attributable to defendants Rubin and Berman lacked the scienter necessary for a finding of liability. The conduct of defendants Rubin and Berman was neither intended to deceive nor was it so reckless as to be virtually indistinguishable in its culpability from deliberate fraud.

**32.** Plaintiff contends that any customer with whom Royal did business in 1972 but not in 1973 is a "lost" customer about whom defendants should have informed plaintiff. This definition strains our common sense, and we reject it. A lost customer is one who, on its own initiative, decides to buy from some other seller. The only evidence which plaintiff placed in the record on the factual issue of lost customers was a list of customers with whom Royal dealt in 1972 but not in 1973. Although Rubin testified on direct examination as to the reasons why Royal no longer dealt with some of these customers, the reasons he gave fell generally into one of two categories, either a particular customer no longer bought pools—sometimes because it was out of the pool business, sometimes because it was starting to manufacture its own pool line—or Royal, on its own initiative, chose not to deal with a 1972 customer because it had been delinquent in paying Royal. Tr. at 20:2479–89. Style, with whom Royal had done a substantial amount of business in 1972, was in this latter category. Plaintiff never placed in the record any evidence of the existence of a customer or customers who chose to cease doing business with Royal *and* go elsewhere for their supply of pools.

## B. Liability of Defendants Rubin and Berman for Common Law Fraud

■ Plaintiff also claims that the same pre-acquisition conduct it alleges in making its section 10(b) charge renders defendants Rubin and Berman liable for common law fraud. In directing a verdict for the Cohen defendants on the section 10(b) claim, we also directed a verdict for them on the common law fraud claim saying:

I believe that my conclusion that the record cannot support a jury finding of scienter under Section 10(b) disposes as well of the Common Law Fraud claim against the Cohen defendants, since the scienter requirement under Common Law Fraud is as strict as, probably stricter than, the requirement under Section 10(b).

Tr. at 18:2073. Plaintiff contends in its post-trial brief at 178–82 that this position is erroneous and that under New Jersey law, applicable here, "knowledge in a common law fraud action is even more relaxed than the Sec. 10b standard adopted by this Court." Plaintiff's brief at 178. Plaintiff has misread New Jersey law. After examining the New Jersey cases that plaintiff cites, we find that they deal not with a relaxed standard of knowledge but with a particular species of *knowing* misrepresentation. In New Jersey

[l]egal fraud or misrepresentation consists of a material representation of a presently existing or past fact, made with knowledge of its falsity, with the intention that the other party rely thereon, and he does so rely to his damage.

*Foont-Freendenfeld Corp. v. Electro Protective Corp.*, 126 N.J.Super. 254, 257, 314 A.2d 69, 71 (App.Div.1973), aff'd. 64 N.J. 197, 314 A.2d 68 (1974) (citation omitted). The particular species of knowing misrepresentation that plaintiff's cases examine is misrepresentation by a defendant that he knows a fact to exist of his own knowledge when, in fact, he has no personal knowledge one way or the other and/or is relying on someone else's opinion. Thus, in *Plimpton v. Friedberg*, 110 N.J.L. 427, 166 A. 295 (1933), defendant was held liable for com-

mon law fraud for representing to plaintiff that he knew personally that the paintings he was selling plaintiff were a Romney, a Gainsborough, and a Reynolds when, in fact, he had no such knowledge and was simply transmitting the opinion of others. The court said:

falsity may consist in making representation of a material fact knowing it to be false, or in making a representation which is untrue without knowledge whether it is true or false *and by coupling with the representation an express or implied affirmation that it is known to be true of personal knowledge.*

110 N.J.L. at 428–29, 166 A. at 296 (emphasis added). This is not a relaxing of any knowledge requirement but merely an application of the knowledge requirement to a particular kind of deliberately fraudulent conduct. We remain convinced, therefore, that a finding that a party lacked scienter under section 10(b) disposes of any common law fraud claim against that party. Thus we find that plaintiff fails in its common law fraud claim against defendant Rubin and defendant Berman.

## C. Liability of All Defendants for Breach of Contract

### 1. Purchase Agreement, ¶ 4.2(e): Financial Warranty

■ By the terms of the ¶ 4.2(e) of the Purchase Agreement, defendants warranted that both Royal's January 31, 1973, audited financial statement and its April 30, 1973, unaudited financial statement were "accurate, correct and complete and fairly present[ed] the financial position and operations of Royal as of said dates and for the periods indicated." Plaintiff asserts that defendants breached this warranty since the April 30, 1973, statement was inaccurate. Defendants concede that the April 1973 statement was inaccurate although they dispute with plaintiff the amount of the inaccuracy. We conclude, therefore, that defendants breached ¶ 4.2(e) of the Purchase Agreement and are liable to plaintiff for any damages resulting from this breach.

2. *Purchase Agreement, ¶ 4.2(q)(ii) and 4.1(d and f)*

Paragraph 4.2(q)(ii) of the Purchase Agreement warrants, among other things, that

There are no contracts, agreements, instruments or commitments, written or oral, to which Royal is, in any manner whatsoever, subject to any prohibitions, restrictions, or directions with respect to

(a) The . . . selling or otherwise disposing of or dealing with any products or services of any kind whatsoever. . . ., including, but without limiting the generality of the foregoing, any restriction on the right of Royal to . . . sell or otherwise dispose of or deal with any of the said products or services in the United States or Canada. . . . .

Paragraph 4.1(d and f) of the Purchase Agreement warrants that none of the defendants has any legal or equitable interest in another business with which Royal has a business relationship or which is engaged in producing or selling any product produced or sold by Royal. Plaintiff contends that defendants breached the first warranty both through Royal's general practice of giving dealers so-called "protected territories" and through more formal written agreements with Style, Apex, and Regency.[33] Plaintiff contends that defendants breached the second warranty because of Berman's and Rubin's stock ownership of Regency.

■ Before addressing the question of the breaches themselves, we point out that in this limited area of the contract breach claim, we have considered parol evidence, specifically the testimony of Berman relating his view of the nature of protected territories and his discussions with Schwefel on the subject. This testimony we credit and have included in our findings of fact. Whether we view Berman's testimony as aiding us in interpretation of the meaning of ¶ 4.2(q)(ii) or in determining the intent of the parties, we find that under New Jersey's version of the parol evidence rule, *Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 N.J. 293, 96 A.2d 652 (1953), we may legitimately consider it.[34] According to Berman, then, a man experienced in the selling practices of the pool industry, Royal's practice of granting its dealers protected territories was a common one in the industry and the granting of such territories imposed no legal obligation upon Royal. Schwefel told Rubin he was familiar with the practice through his contacts with Abco, Coleco's subsidiary. Under these circumstances, we conclude that the existence of the various protected territories to which Berman testified did not breach the Purchase Agreement because the parties neither intended nor understood the warranty given in ¶ 4.2(q)(ii) to cover the industry practice of granting protected territories.

As to the questions surrounding Royal's more formal agreements with Apex, Style, and Regency, we note first that we have given plaintiff the benefit of an evidentiary doubt and considered exhibits # # 383, 384, 385, 386, and 387, all correspondence between Royal and Apex in the Winter and Spring of 1973. Even considering these exhibits, however, we can locate in the record little evidence from which one could find that any agreement was in force on June 4, 1973, the critical date here. The Style agreement is dated October 1972; the

---

**33.** We reject the argument of the Cohen defendants made at p. 8 of their post-trial brief that the language of ¶ 4.2(q)(ii) cannot be read to cover exclusive distribution contracts.

**34.** In *Schwimmer* the New Jersey Supreme Court held:

Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the inten-

tion of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance.

12 N.J. at 301–02, 96 A.2d at 656.

Apex correspondence runs into April or May 1973. Regency never really got off the ground although Rubin testified that he believed that the contract with Gascoigne and Mitchell, the men operating Regency, was in effect past the closing date. Tr. at 27:3537. Plaintiff argues that we can reasonably assume that the Apex and Style agreements continued through June 4, 1973. The assumption is obviously more warranted in the case of Apex than in the case of Style. Given this unsatisfactory state of the record, we choose to assume without formally concluding that Royal's agreement with Apex, Style, and Regency breached the warranty contained in ¶ 4.2(q)(ii). We adopt such a procedure since, as we conclude below, the issue of whether or not any damages flowed from breach of ¶ 4.2(q)(ii) is one much more certainly and simply resolved than the issue of the breach itself.[35] We will also follow this procedure, for the same reason, in assuming without formally concluding that Rubin's and Berman's interests in Regency violated ¶ 4.1(d and f) of the Purchase Agreement.[36]

### 3. Purchase Agreement, ¶ 4.2(q)(iv and v): Inventory Warranty

Paragraph 4.2(q)(iv and v) of the Purchase Agreement reads:

(iv) All of Royal's finished inventory will be as of the Closing, in first class salable condition and suitable for the purpose for which it is intended.

(v) All of Royal's raw materials and work in process will be in first class usable condition and suitable for the purpose for which it is intended.

Plaintiff contends that defendants breached this warranty because one pool model, the Castle pool, was defectively designed.[37] Plaintiff further contends that the defective design caused several Castle pools to "blow" or pull apart in August 1973 requiring plaintiff to supply "retrofit kits" to cure the problems on some 1973 pools and on 1974 pools. Although we had serious doubts at trial, doubts that remain with us, that a standard inventory warranty, such as that contained in ¶ 4.2(q)(iv and v), is intended to cover design defect, we admitted evidence on the alleged defect after counsel stipulated that as of June 4, 1973, the closing date, there existed in Royal's inventory at least one complete Castle pool. The evidence on design defect consumed many pages of transcript and was often highly technical. Plaintiff's theory is that Rubin designed the pool with defectively thin walls and impossible welding requirements, both problems contributing to the "blowing" of Castle pools; defendants contend that the Castles pulled apart because of poor installation and shoddy welding. To conserve the judicial energy it would take to sort out any further than we already have the record evidence on this issue, we will again adopt the procedure of assuming without so concluding that defendants breached, in some highly technical way, the inventory warranty in the Purchase Agreement.[38]

---

**35.** Our conclusion on damages also allows us to sidestep the unpleasant question of whether or not, given his knowledge about the relationships between Royal and Apex, Style, and Regency, Michael Schwefel's conduct prior to acquisition, as one of Coleco's attorneys and negotiators, was of a nature requiring us to hold plaintiff equitably estopped from claiming breach.

**36.** Again we will sidestep the equitable issue raised by Schwefel's conduct in light of his knowledge.

**37.** In its proposed finding of fact # 231, plaintiff also contends, for the first time we believe, that the existence of Royal's inventory imbalance breached the inventory warranty. We

reject this position since we do not believe that a standard inventory warranty such as that found in ¶ 4.2(q)(iv and v) can be stretched to cover the problem of inventory imbalance. Alternately, we find that given our finding that plaintiff knew of the inventory imbalance prior to closing, the parties did not intend the inventory warranty to cover inventory imbalance.

**38.** Although plaintiff devotes pp. 127–132 of its post-trial brief to its contention that defendants breached ¶ 4.2(f)(xi) of the Purchase Agreement warranting that defendants had no knowledge of present or future loss of a substantial number of customers, plaintiff, at trial, represented explicitly that this particular warranty was out of the case. So we consider it to be. Tr. at 19:2234. Finally, at footnote 56,

D. *Defenses to Breach of Contract Claim*

1. *Fraudulent Inducement:*

■ Defendant Rubin urges that we declare the Purchase Agreement void or voidable because plaintiff fraudulently induced his entering into it by making various misrepresentations, primarily by misrepresenting its intention to pay out to suppliers several hundred thousand dollars upon closing.[39] Under New Jersey law, however, a party claiming fraudulent inducement faces the difficult task of proving by clear and convincing evidence that the representations he attacks were not merely promises, collateral to the contract, to do something in the future but rather intentional misrepresentations of a present state of mind. *Minter v. Bendix Aviation Corp.*, 26 N.J.Super. 268, 274, 97 A.2d 715 (App.Div.1953); *Ocean Cape Hotel Corp. v. Masefild Corp.*, 63 N.J.Super. 369, 164 A.2d 607 (App.Div. 1960). The court in *Ocean Cape Hotel Corp.* explains the difficulty this way:

> In order to form the basis for an action in deceit, the alleged fraudulent representation must relate to some past or presently existing fact and cannot ordinarily be predicated upon matters *in futuro*. . .
> An exception to this rule exists in the case of a false representation of an existing intention, *i. e.*, a "false state of mind."

> If [a party's] alleged representation was a mere promise collateral to the contract, and not an affirmation of a present state of mind, then fraud may not be found because there has been no statement of an existing fact.

63 N.J.Super. at 380, 164 A.2d at 612. The court goes on to list some considerations relevant to a finding vel non of fraudulent inducement:

> Misrepresentation of a present state of mind, with respect to a future matter, may be concluded from the utter recklessness and implausibility of the statement in light of subsequent acts and events; from a showing that at the time of the making of the promise, the promisor's intention to perform was dependent upon contingencies known to the promisor and unknown to the promisee; or from circumstances indicating that the promisor must have known at the time of his promise that he could not or would not fulfill it. (Citations omitted).

*Id.* at 381, 164 A.2d at 613. Guided by the analysis of· the *Ocean Cape Hotel* court, then, we conclude that defendant Rubin has not met his burden of establishing that plaintiff fraudulently induced him to enter into the Purchase Agreement. Although we have found Coleco's conduct in acquiring Royal curious and even questionable, we are not clearly and convincingly persuaded that representations Coleco made as to how it would run Royal after acquisition were anything but "promise[s] collateral to the contract." After assessing the record before us, we cannot find that plaintiff's promises were reckless or implausible or contingent upon some event known to plaintiff but unknown to defendant Rubin; nor can we locate circumstances from which to infer that Coleco must have known at the time of its promise that it could or would not perform.

2. *Equitable Estoppel:*

■ The Cohen defendants contend that Coleco's knowledge, through Glassman's revelations of costing inaccuracies, of

plaintiff's post-trial brief (pp. 126–27), plaintiff lists eleven other sections of the Purchase Agreement which it claims defendants breached. Plaintiff does not discuss these sections, however, stating "by their breach of the specific warranties. . . . , defendants also breached these more generalized warranted (sic). . . . " Since this is plaintiff's position, we remark only that while we doubt many of the sections of the Purchase Agreement cit-

ed by the plaintiff are related to the so-called specific warranties, we find nothing in these contract sections that would lead us to alter our findings and conclusions in this action.

**39.** Defendant Rubin also alleges that he was fraudulently induced to enter into the Purchase Agreement by promises of production foremen, pool parts, and trucking services.

discrepancies in the financial statements estops plaintiff from claiming damages from the Cohens for breach of the financial warranty since Coleco knew the Cohens, as non-managing shareholders, were unaware of the discrepancies and failed to reveal them. In urging their position defendants rely on *Huck v. Gabriel Realty Co.,* 136 N.J.Super. 468, 346 A.2d 628 (1975) and on a Louisiana case, *Calhoun v. American Marine Corp.,* 159 So.2d 19 (App.Div.La.). In *Huck* plaintiff was prevented from recovering on an indemnity contract because, in contracting with defendant broker for indemnity against any other broker who claimed a commission from plaintiff on a particular land transaction, plaintiff deliberately concealed from defendant broker that he had been shown the property in question by another broker prior to enlisting defendant's services. *Huck,* then, is a case involving active and intentional misrepresentation and, as such, is not particularly helpful in this case. The facts in the *Calhoun* case are admittedly much closer to the facts here. *Calhoun* is, however, a Louisiana and not a New Jersey case. More significantly, the warranty considered by the *Calhoun* court is much differently worded than the warranty here. In *Calhoun* the sellers warranted that

> Sellers know of no material facts affecting Louisiana Materials or Heartland which have not been disclosed to Purchaser.

In the case before us the financials are unqualifiedly warranted as accurate and # 13 of the Purchase Agreement states plainly:

> Coleco shall not be deemed to have waived the protection afforded it by any representation, warranty or agreement made by the Stockholders notwithstanding the fact that Coleco may have or could have known at the time of Closing that any such representation, warranty or agreement was or might be inaccurate or had been or could have been breached.

In *Calhoun* the court also relies heavily, in holding the buyer remediless, on the amount of time—a good week—during which buyer's accountant examined seller's books pre-acquisition. Here the examination was more cursory.

Furthermore, as plaintiff points out, under New Jersey case law on equitable estoppel,

> there is no obligation to disclose matters of which the other party has actual or constructive knowledge or as to which the information or means of acquiring information of the two parties is equal.

*Sanders v. Reid,* 131 N.Y.Eq. 407, 25 A.2d 541 (1942).[40] Certainly, under the facts of this case, the Cohen defendants, as three of the five Royal shareholders and in view of Irvin Cohen's direct ties with Royal's accountant, Zelnick, Sobelman, and Co., had as much access to the financial information in question as did plaintiff. Plaintiff also cites *Deerhurst Estates v. Meadow Homes, Inc.,* 64 N.J.Super. 134, 165 A.2d 543 (App. Div.1960), in support of its position that it is not equitably estopped from claiming breach of the financial warranty. In *Deerhurst,* plaintiff discovered between the time of the execution of a land sales contract and closing of title that two of the contract warranties were breached but went ahead with closing and then sued for breach of warranty. The appellate court affirmed a verdict for plaintiff holding:

> Simply because he is informed by the defaulting party that the latter cannot or will not perform one of his obligations under the contract, the injured party, by choosing to proceed nonetheless, obviously does not manifest agreement that the performance received is in full satisfaction of all contractual obligations.

64 N.J.Super. at 145, 165 A.2d at 549. Although we agree with defendants that *Deerhurst* is significantly different from this case because in *Deerhurst* plaintiff's contractual rights had already vested when it learned of the breach, we point out that

---

**40.** In *Sanders v. Reid,* the defendant was held not equitably estopped from exercising property rights over her driveway even though she had said nothing about such rights when plaintiff built a new garage to which access could be had only by the driveway.

the *Deerhurst* court does have this to say on the nature of estoppel:

> Estoppel . . . is a doctrine grounded in equity, to the effect that one who performs an act or takes a position upon which it is intended that another rely cannot repudiate the act or the position where an unjust and unconscionable result would flow from such repudiations. . . . There was no repudiation on the part of Deerhurst in the case at bar. It took the position throughout that it was entitled to the benefit of all of the warranties included in the contract of sale and preserved beyond the closing date . . . . Meadow cannot claim prejudice through goodfaith reliance on any position which has subsequently been discarded.

*Id.* at 147, 165 A.2d at 550. In this case, as in *Deerhurst,* plaintiff has taken "the position throughout that it was entitled to the benefit of all of the warranties included in the contract of sale and preserved beyond the closing date." Moreover, accepting for the sake of argument defendants' theory that the silence at closing of plaintiff's representatives on the status of the financial warranty might have been in some way misleading, we find in the record no evidence of defendants' reliance on the implications of this silence. Defendant Irvin Cohen, the spokesman for the Cohen defendants, testified, in answering a question about the extent of his reliance in signing the financial warranty on the implied knowledgeability of plaintiff's representatives:

> Well, that really had nothing to do with my signing the agreement. That had to do with their signing the agreement.

Tr. at 31:4405. In view of New Jersey law, then, and of the distinctions between the facts of this case and those of *Calhoun v. American Marine Corp.,* we hold that plaintiff is not equitably estopped from claiming damages from the Cohen defendants for breach of the financial warranty. Considering the wording of the warranty itself, the unambiguous import of ¶ 13 of the Purchase Agreement, the equality of access of plaintiff and the Cohen defendants to Royal's books and records, and plaintiff's relinquishment of its pre-acquisition demand for a June 30, 1973, full audit in return for a strong financial warranty, we conclude that Coleco's failure to disclose to the Cohen defendants the storm warnings it got from Glassman does not defeat its claim for breach of that warranty.[41]

### E. Damages Resulting from Breach of Contract

#### 1. Damages Resulting from Discrete Breaches:

##### a. Financial warranty

█ Defendants concede that the April 30, 1973, unaudited financial statement was inaccurate in the amount of $49,922.88.[42]

---

**41.** Defendants Rubin and Berman raise a similar defense to plaintiff's claims of breach of warranty. They contend, in a two-step argument, first, that parol evidence is admissible on any breach claim to show that plaintiff had pre-acquisition knowledge of the breach, and, second, that such parol evidence clarifies the intent of the parties that the warranties were not to cover those problems of which Coleco had knowledge. Since we find damage flowing only from breach of the financial warranty, we have entertained defendants' theory only as it relates to such a breach. Having considered, then, the relevant parol evidence, we find it inadmissible on the issue of breach. Given the clear, strong language of ¶ 13 of the Purchase Agreement, the extensive detail of the Purchase Agreement, and the circumstances surrounding the acquisition, we conclude that the intent of the parties, as revealed by the Purchase Agreement itself and the circumstances of its negotiation, was to hold defendants liable for breach of the financial warranty whether or not Coleco had pre-acquisition knowledge that the warranty was or might have been breached.

**42.** Of this amount $17,372.88 is attributable to the failure of Royal's accountants to multiply the material cost of a Jewel pool by the number of Jewel pools sold in February, March, and April 1973; $32,550 is attributable to the accountants' failure to reduce inventory by $350 per pool for a certain amount of finished pools sold between September 1972 and April 1973. In September 1972, when a physical inventory was taken at Royal, its accountants added $350 to reflect labor costs to Royal's inventory evaluation for each finished pool in inventory. This was the $350 per pool that should have

This amount of breach is certain, therefore. Plaintiff contends, however, that erroneous pool costing rendered the April 1973 statement inaccurate in the further amount of approximately $80,000. To prove this discrepancy, plaintiff offered in evidence the testimony of James Hubert, its controller, that he had costed the Royal pools after acquisition by examining individual parts invoices and found that mistakes in costing resulted in the $80,000 discrepancy in the April 1973 statement.[43] Hubert's testimony was bolstered by that of an expert witness, Irvin B. Schumer. Defendants attack plaintiff's damage evidence upon the following theory. As testified to by Hubert, Royal's accountants in preparing the Royal statements used an accounting technique called the FiFo (first in, first out) system under which, as testified to by Hubert, an accountant in determining costs of goods in order to relieve inventory must assume that a manufacturer, in this case Royal, used existing rather than newly-purchased inventory to make his product.[44] Tr. at 10:1163–64. On January 31, 1973,[45] Royal had between $430,000 and $469,000 of pools and parts of pools in inventory, all but $87,000 of which was purchased in the first half of 1972; the remaining $87,000 was purchased in the second half of 1972. Tr. at 10:1158–60, 12:1360–73, and 14:1501. When Royal's accountants prepared the April 1973 statement they were dealing with the cost

of the 407 pools assembled and delivered during February, March, and April 1973. Tr. at 12:1363. About 70% of the materials used to make these 407 pools was used to make the same model pools as had been made in 1972. Tr. at 10:1163. Under the FiFo accounting system, Royal's accountants would have presumed that these pools were made from the materials in inventory on January 31, 1973, that is, from materials purchased by Royal in 1972, and mostly in the first half of 1972. Tr. at 10:1163–64. Yet plaintiff's proof that the pools sold in February, March, and April 1973 were undercosted in the amount of $80,000 is based on Hubert's examination of material invoices for the period March through June 1973. Tr. at 10:1154–56 and 13:1484. About 30% of the materials used to make the 407 pools was used to make the Castle pool, a pool newly-designed in Fall 1972 and first sold and delivered in March 1973. Even in the case of the Castle pool, however, it is quite possible that a substantial amount of the materials out of which the February, March, and April Castles were made was purchased before March 1973 and May and June invoices would not be relevant at all. Based on this theory built on record evidence, defendants argue strenuously that plaintiff has failed to prove with reasonable certainty the additional $80,000 deficit because, quite simply, Hubert used the wrong invoices in checking the April 1973 state-

---

been deducted each time one of these finished pools was sold.

**43.** In this area of damage testimony, Hubert testified as an expert. Although he had not been listed in the final pretrial order as an expert witness, we permitted him to testify as an expert in the interest of justice and after giving defendants overnight to depose him in his capacity as an expert.

**44.** In attempting to resolve an evidentiary problem, we allowed counsel for the Cohen defendants to cross-examine Hubert outside the hearing of the jury which was, at that point in the proceedings, still sitting. At p. 8 n. 4 of its reply brief plaintiff argues we cannot consider the testimony of Hubert, during this cross-examination on Royal's use of the FiFo system since it was "offered for a limited purpose and was therefore not subjected to contradiction or verification . . . during redi-

rect, or at any subsequent point in the trial." We disagree. First, Hubert was under oath and Coleco's own man. Second, the purpose of Hubert's testimony outside the hearing of the jury was, in the words of defendant Cohens' counsel who suggested the method, to demonstrate to us that Hubert's "testimony will prove to be incompetent even if he were an expert." Tr. at 10:1136. And, in fact, counsel moved to strike Hubert's damage testimony on the ground that it was incompetent. The trial having subsequently proceeded non-jury, we chose to regard the flaws in Hubert's damage testimony as going to the weight of plaintiff's evidence rather than to as rendering the testimony incompetent.

**45.** February 1, 1973 was the beginning inventory date for the April 1973 statement.

ment.[46] Plaintiff's expert Schumer did no more than doublecheck Hubert's calculations using the same materials Hubert had used. Tr. at 13:1484. Defendants further argue that the use of March through June 1973 invoices to prove a discrepancy in the April 1973 statement of a business using a FiFo system of accounting is particularly devastating to plaintiff's case in view of the testimony of several of plaintiff's representatives that they were aware in Spring 1973 of substantially increasing prices of aluminum, the basic material of a Royal pool. We must agree with defendants that plaintiff has not carried its burden of proving this $80,000 item of damage by a preponderance of the evidence and with reasonable certainty. Admittedly, the record contains evidence, not offered by plaintiff, that Glassman discovered discrepancies in the costing of most of the Royal pool models. Glassman's figures were only quickly-made estimates, however, and cannot help plaintiff in establishing any particular amount of discrepancy.

██ Plaintiff attempts to dismiss defendants' theory on the grounds that Hubert's and Schumer's testimony stands uncontradicted and that defendants "offered no evidence of the actual costs of goods sold during the period or of specific increases in particular cost items over 1972 levels." Plaintiff's post-trial brief at 119. As to the

unassailability of Hubert's and Schumer's testimony, we believe it was seriously undercut on cross-examination during which defendants established that Royal used the FiFo system, that it had a very substantial amount of 1972 inventory, and that Hubert had used March through June 1973 invoices in reaching his conclusion about the inaccuracy of the April 1973 statement. Regarding defendants' failure to prove the actual cost of goods or 1973 price increases on specific items, we need only point out that the burden of proving damages with reasonable certainty was on plaintiff not on defendants. Defendants needed only to call plaintiff's method of assessing damages into serious question; this they did. We conclude, therefore, that in the absence of reasonably certain proof that there existed in addition to the $49,922.88 discrepancy in the April 1973 statement conceded by defendants an $80,000 discrepancy, defendants are liable to plaintiff only in the amount of $44,922.88 [47] for breach of the financial warranty.[48]

b. Exclusive contracts and inventory warranties

██ In section IIC(2 and 3) of this Opinion, we assumed without so concluding that defendants had breached ¶ 4.2(q)(ii) of the Purchase Agreement warranting that Royal

**46.** Defendants first raised their challenge to Hubert's damage calculations on November 3, 1975, during the course of an oral argument on plaintiff's motion for summary judgment. At that time counsel for the Cohen defendants argued that plaintiff's agent had examined the invoices for the wrong period of time and that costs of material purchased from March through June 1973 are irrelevant and not probative on the issue of the amount by which the April 1973 financial statement was inaccurate. Then, without notifying opposing counsel and without moving to amend its final pretrial order, which would lead one to believe that plaintiff was relying on the March through June 1973 invoices, as would the affidavit attached to plaintiff's motion for summary judgment, plaintiff retained an accounting firm in Philadelphia to examine 40% of the 1972 invoices. The firm apparently carried out this work over a period of three weeks and then on November 24, 1975, two weeks into the trial, plaintiff offered to prove through accounting witnesses

that there was no substantial difference in the cost of parts between the 1972 and 1973 invoices. Although we recognized the blow we dealt to plaintiff's damage case, we ruled this evidence inadmissible on the ground that its use would constitute unfair surprise and would unduly prejudice defendants. We elaborate on this ruling at 11:1256–58 of the trial transcript.

**47.** Under ¶ 14.4(b) of the Purchase Agreement, defendants are liable only for damages for breach of contract that exceed $5000.

**48.** Had we found the full $130,000 discrepancy in the April 1973 statement which plaintiff attempted to prove, this would not have affected our Findings and Conclusions below on the cause of plaintiff's $1 million loss. We do not believe that even a $130,000 discrepancy with the reduction in profitability which it implies either rendered Royal valueless or caused Royal's failure.

was subject to no selling restrictions and ¶ 4.2(q)(iv and v), the inventory warranties.[49] We will treat together the issues of damages flowing from these particular breaches, and we find, in short, that the record is almost totally devoid of evidence upon which we could base an award of damages. As far as a breach of ¶ 4.2(q)(ii) is concerned, plaintiff offered no evidence that it lost sales because of sales restrictions assumed by Royal prior to acquisition. Although plaintiff offered some evidence that Royal was involved in post-acquisition litigation in which the opposing party claimed breach of an exclusive contract, this fact, without more, hardly proves either the existence of such a contract or any amount of breach damage. Furthermore, insofar as plaintiff claims that Royal's handling of its alleged exclusive contracts generated ill-will among its customer/dealers, we point out only that the record lacks any evidentiary support for this proposition. Nor is there any way we can determine from this record an amount of damages sustained from breach of the inventory warranties. Plaintiff offered no evidence that any of the handful of Castle pools that "blew" during the Summer of 1973 were in inventory at closing, and plaintiff seemed almost studiously to avoid placing in the record any dollar amount attributable to designing and distributing the retrofit kits. Finally, the record lacks any substantial evidence of loss of customer good will resulting from the selling of defectively designed Castle pools. Rather the record supports a finding that plaintiff made an obvious and apparently successful attempt in November 1973 to use the Royal name to attract sales for its subsidiary, Abco. We conclude, therefore, that plaintiff has failed to prove by a preponderance of the evidence any amount of damages flowing from breaches of ¶ 4.2(q)(ii) and ¶ 4.2(q)(iv and v) of the Purchase Agreement.[50]

### 2. Plaintiff's Enterprise Theory of Damages:

Under what plaintiff denominates its enterprise theory of liability, it claims damages in the amount of $878,739.65 for out-of-pocket expenses attributable to its operation of Royal post-acquisition and $135,754.52 plus $27,000 interest, the segment of the purchase price that plaintiff paid at closing. Plaintiff contends that various breaches of the warranties in the Purchase Agreement amounted to a "total breach" of contract because they rendered Royal valueless. As a result, plaintiff urges, it should, at least,[51] be reimbursed for any monies it expended in purchasing and running Royal. We can accept the proposition that had defendants delivered to Coleco at closing a mere corporate shell lacking substantially all of the commercial attractiveness defendants had promised including new pool designs and a ready market, this type of breach could have amounted to a total failure to perform on defendants' part, in spite of their delivery of Royal's stock to Coleco, and this failure to perform might have entitled Coleco to recover the amount paid on the purchase price as well as any reasonable sums expended in reliance upon defendants' performance. See Restatement of Contracts 2nd, ¶ 268 (Tent.Draft No. 8,

49. We also assumed that defendants had breached ¶ 4.1(d and f) because of their ownership of Regency pool company in Canada. Nothing in the record suggests any damages flowing from such a breach. Indeed, it appears Regency was an abortive enterprise.

50. Plaintiff's counsel represented to us two weeks into trial that because of a shift in emphasis in plaintiff's case after its settlement with Zelnick, Sobleman & Co. and because of inexperience on the part of the attorneys who did the pretrial preparation, he felt it necessary to plaintiff's case to offer the testimony of additional witnesses on the issue of breaches of ¶ 4.2(q)(ii) and ¶ 4.2(q)(iv and v) and damages flowing from these breaches. Counsel therefore moved to amend plaintiff's final pretrial order by adding thirty-five additional witnesses. We denied this motion to avoid prejudice to defendants and in the interest of the orderly administration of justice. Tr. at 9:920–24.

51. Plaintiff's original damage statement included a claim for certain lost profits. We dismissed this claim at trial on the basis that an award of lost profits, on the facts of this case, would be too speculative.

1973). As we have found in Part I of our Opinion, however, this was not the case. At the very least, defendants delivered to plaintiff at closing a substantial inventory, pool designs, and customers.[52]

Rather, a more appropriate contention, under the facts of this case, is that defendants' contract breaches taken together doomed Royal's business to failure from the beginning or, to translate more fully into legally cognizable terms, defendants' contract breaches were causally and foreseeably related to Royal's failure which, in turn, caused plaintiff's losses. One preliminary difficulty with plaintiff's enterprise theory, even as we define its legal elements, is that the theory is immediately incongruous with our conclusion that plaintiff has proved only $44,922.88 in damages flowing from the different discrete breaches we have found. Even considering that the inaccuracy in the April 30, 1973, financial statement was directly and adversely related to Royal's percentage of profit on each pool model, it strains credulity to accept plaintiff's contention that discrete breaches, the reasonably ascertainable damages from which amount to less than $50,000, causally and foreseeably precipitated over $1 million in total damages. Above and beyond this incongruity, however, our factual findings require us to conclude that plaintiff has not proved by a preponderance of the evidence that defendants' breaches of contract resulted in the heavy damages plaintiff alleges. In order for us to reach the opposite conclusion, we would have to determine on the record before us that defendants' breaches, taken together, caused plaintiff's damages and that the amount and source of these damages were reasonably foreseeable at the time of contracting. *Hadley v. Bax-*

*endale,* 9 Exch. 341 (1854). We can make neither finding.

> Under New Jersey law [t]he measure of damages for a breach of warranty is . . . the loss directly and naturally resulting in the ordinary course of events from such breach. . . . The inescapable inference is that the damage complained of must stem from the breach of warranty and not from some other cause.

*Prashker v. Beech Aircraft Corp.,* 258 F.2d 602, 607 (3d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958). In contending for their respective positions on the issue of causation, all parties appear to adopt a species of "but for" theory and argue about the meaning of the following testimony of Arnold Greenberg:

> Q. This morning, I think you testified, sir, that even if Rubin and Berman had innocently made a $100,000 mistake in terms of inventory, you would not have wanted to go through with the deal.
>
> A. Not for the price we are paying. Not for the million dollars.

Tr. at 3:250. In other words, the parties apparently agree that the relevant inquiry on the issue of causation is whether or not plaintiff would have gone through with the acquisition, albeit on adjusted contractual terms, if it had known about the problems created by the breaches. Although we find Arnold Greenberg's statement, by itself, too ambiguous to allow an answer to this question, two other considerations lead us to conclude that plaintiff has failed to prove causation under a "but for" theory. First, the contract negotiations and the Purchase Agreement itself obviously contemplated

---

52. The only evidence plaintiff offered of Royal's value on June 4, 1973, was the testimony of Coleco's treasurer Edward Fialkowsky that Royal, at closing, had no value. Tr. at 18:2155. Fialkowsky's opinion was based principally on Hubert's version of the correct April 1973 figures and on Royal's documented overhead and operating expenses. Tr. at 18:2150–51. We find Fialkowsky's testimony not to be probative for three reasons. First, Hubert's version of the April 1973 statement was never suffi-

ciently established. Second, although the valuation of Royal with its tangible as well as intangible assets would have required expert analysis, Fialkowsky was not qualified as an expert witness. Third, as the record reveals, Fialkowsky's contacts with Royal were few and fleeting; he did not, therefore, have the intimate knowledge of Royal's workings which sometimes allows a lay witness to venture an opinion on value.

the possibility that Royal might not be as profitable as everyone thought or as the April 1973 financial statement represented it to be. Presumably, the June 30, 1973, full audit, which Coleco originally demanded as a condition precedent to closing, would have revealed to plaintiff that the Royal pools were less profitable than they believed. Coleco relinquished the audit demand, however, in return for a substantial reduction from $1,000,000 to $500,000 in the non-contingent purchase price and for the contract warranties. Moreover, even the reduced non-contingent payout was arranged so that the largest single payment of $250,000 plus interest was not due until January 2, 1976. Ex. # 1 at ¶ 1.3(b). Arnold Greenberg explained Coleco's negotiating formula this way:

> We take the million dollars, divide it in half, take $500,000 and put it at the end and provide that if Royal's earnings for the years 1973, 1974 and 1975 reach a prescribed amount, then they can earn the second $500,000.
>
> The first $500,000, we would pay out in fact over a period of two years. We would pay at the closing, not $250,000, but a smaller amount, about $140,000, I think is what we proposed at that time.
>
> In other words, if we were to be persuaded to go forward without a June 30 audit, they ought to wait for their money, is what I suggested.

Tr. at 2B:58. Thus Coleco clearly entertained the possibility that Royal might not be as valuable an acquisition as hoped and, rather than calling off the deal in the absence of a full audit, built heavy warranty protections into the Purchase Agreement. Second, even if the contract negotiations and terms of the Purchase Agreement did not so mirror Coleco's willingness to contract in spite of uncertainty about Royal's value, we would still reject plaintiff's contention that had it known about discrepancies in the April 1973 statement, it would not have acquired Royal. As we have found, plaintiff, through Glassman, its costing expert and agent, was put on pre-acquisition notice that he had discovered errors in the costing of Royal pools pervasive and

material enough to be of concern; despite this caveat, Coleco proceeded to closing. Even under a "but for" theory of causation, then, plaintiff's proof fails.

We are not, however, as comfortable as the parties to this action with a "but for" theory of causation. We think an alternate, and perhaps more correct way, of assessing causation in a contract breach case is to determine whether or not plaintiff has proved by a preponderance of the evidence that the event generating plaintiff's damage claim, in this case Royal's failure to operate profitably, occurred because of defendants' breaches. Addressing this question, we conclude that plaintiff has not shouldered its burden. We have already found that the more probable cause of Royal's immediate post-acquisition difficulties and eventual disintegration was not problems arising from contract breaches but Coleco's miscalculation on the kind and amount of assistance Royal needed to enhance its chances of success. Royal was in operation only eighteen months when Coleco acquired it and had operated during 1972 at a substantial loss. The success of Coleco's investment in Royal's fledgling enterprise obviously depended on Coleco's shoring up Royal's weaknesses, especially its cash flow problems. We have found that Coleco's failure to do so was the most likely cause of Royal's failure. Thus, the event which precipitated Coleco's loss of over $1 million was not caused by defendants' actions but by plaintiff's own conduct. On the issue of causation, then, we conclude that the nature of the contract negotiations in this case, the terms of the Purchase Agreement itself, and Royal's history subsequent to acquisition demonstrate it much more likely than not that defendants' breaches did not cause the damages plaintiff claims.

■ Although our conclusion that plaintiff has not proved causation fairly ends our inquiry, we record our agreement with defendants that plaintiff has likewise failed to establish that its loss was reasonably foreseeable. Although plaintiff discovered the

problems with Royal's financial status in August 1973, it never attempted to rescind the contract and tender back the Royal stock; nor did it attempt at summer's end 1973 to place a value on Royal which had had a sizable if imbalanced inventory at closing, which purchased three quarters of a million dollars in inventory during the Summer of 1973, and which possessed other assets such as its pool designs and a stable of customers.[53] Instead Coleco operated Royal for two years and now, tendering nothing back, demands return of the portion of the purchase price it paid as well as all monies, exceeding Royal's income, which it paid out in operating Royal for that two years. This course of conduct was surely not in the reasonable contemplation of the parties at the time of contracting.[54]

F. *Defendants' Claims Against Third-Party Defendant Zelnick, Sobelman, and Company*

1. *Defendant Rubin's and the Cohen Defendants' Negligence Claim Against Zelnick, Sobelman, and Company*

Defendant Rubin and the Cohen defendants [55] contend that Zelnick, Sobelman, and Company (Zelnick), Royal's accounting firm, having negligently performed a duty owed to them, is liable to them for any amount of damages we award plaintiff for breach of the financial warranty. Zelnick responds that defendants' claim must fail

because of a lack of privity between Zelnick and defendants and because the financial warranty that defendants breached imposed on them a higher duty of care than can be imposed on Zelnick. Although the state of the law in this area is uncertain, we conclude that Zelnick's argument cannot prevail and defendants' claim is a valid one.

■ The more difficult question raised by defendants' claim is whether or not parties not in strict privity with an accountant can invoke a duty of care running from the accountant to them. The contract, in this case, was between Zelnick and Royal not between Zelnick and the individual defendants; thus there is no strict privity between Rubin and the Cohens and Zelnick. Although we can find no New Jersey cases and only one vintage Pennsylvania case treating the issue under consideration, we note that modern courts often begin their analysis of a privity requirement with an examination of Justice Cardozo's opinions in *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922) and *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931). *See, e. g., Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85 (D.R.I.1968) and *Aluma Kraft Manufacturing Co. v. Elmer Fox & Co.*, 493 S.W.2d 378 (Mo.App.1973). In *Glanzer*, Cardozo held public weighers liable to a buyer of bags of beans for breach of a duty to weigh the beans carefully. In reversing the New York appellate court, which had found for

---

**53.** It is interesting to note in connection with Royal's ability to attract customers that the two lawsuits against Royal by pool dealers identified in the papers attached to the Purchase Agreement both appear to have involved dealer demands that Royal deliver more pools than it was willing or able to supply.

**54.** At p. 207 of its post-trial brief plaintiff lists as an item of damage $16,517 for "Costs of Defending Suits Brought against Royal." We are not sure on what this claim is based, whether on the enterprise theory or on ¶ 14.3 of the Purchase Agreement which indemnifies Coleco against fees and costs of suits occasioned by breaches of warranty. If the claim is based on the enterprise theory, it fails with our rejection of the theory. If it is based on ¶ 14.3, the claim fails because there is no record evidence that third-party litigation expenses were occasioned by Royal's breach of warranties.

**55.** At p. 1 of its post-trial brief, Zelnick, Sobelman, and Company contends that the Cohen defendants' crossclaim is insufficiently pleaded. Looking at Document # 8 in the case file, the Cohen Answer, Crossclaim, and Counterclaim, we have to agree with Zelnick that the claim against it is unsatisfactorily pleaded. Although Zelnick is listed in the crossclaim heading and relief is demanded against it, there is no statement of the basis upon which the Cohens demand relief from Zelnick. Near the end of trial, however, counsel for the Cohens moved that if the pleadings were deficient, they be conformed with the proof. We consider this a motion pursuant to Fed.R.Civ.P. 15(b), and we grant the motion.

We also point out here that only defendant Rubin and the Cohen defendants claim against Zelnick; defendant Berman does not.

defendant on the ground that plaintiff had no contract with the weighers, Cardozo said

> We think the law imposes a duty toward buyer as well as seller in the situation here disclosed. The plaintiffs' use of the certificates was not an indirect or collateral consequence of the action of the weighers. It was a consequence which, to the weighers' knowledge, was the end and aim of the transaction. . . assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed. We do not need to state the duty in terms of contract or of privity. Growing out of a contract, it has none the less an origin not exclusively contractual. Given the contract and the relation, the duty is imposed by law.

233 N.Y. at 238–39, 135 N.E. at 275. In *Ultramares*, Cardozo refused to hold accountants liable to plaintiff corporation which had loaned money to another corporation relying in part on an inaccurate balance sheet certified by the accountants. In reciting the facts, however, Cardozo emphasized that

> Nothing was said as to the persons to whom these counterparts would be shown or the extent or number of the transactions in which they would be used. In particular there was no mention of the plaintiff, a corporation doing business chiefly as a factor, which till then had never made advances to the Stern Company, though it had sold merchandise in small amounts.

255 N.Y. at 174, 174 N.E. at 442. He also distinguished *Ultramares* from *Glanzer* on the basis that in *Glanzer*:

> the transmission of the certificate to another was not merely one possibility among many, but the "end and aim of the

transaction," as certain and immediate and deliberately willed as if a husband were to order a gown to be delivered to his wife . . . .. The bond was so close as to approach that of privity, if not completely one with it. Not so in the case at hand. No one would be likely to urge that there was a contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants now before us to the indeterminate class of persons who, presently or in the future, might deal with the Stern Company in reliance on the audit. In a word, the service rendered by the defendant in *Glanzer v. Shepard* was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee.

*Id.* at 182–83, 174 N.E. at 445.

We agree with the courts in *Rusch Factors* and *Aluma Kraft* that *Glanzer* and *Ultramares* are, as Justice Cardozo stated, distinguishable and we find the facts of the present case to be closer to those of *Glanzer* in spite of their superficial resemblance to those of *Ultramares*. Here the bond between defendants and Zelnick "was so close as to approach that privity, if not completely one with it." Moreover, defendants use of the April 1973 statement "was not merely one possibility among many, but the 'end and aim of the transaction'." Finally, defendants in this case were not members of an "indeterminate class of persons who, presently or in the future, might deal . . in reliance on the audit." [56] We also agree with the *Rusch Factor* court that regardless of whether *Glanzer* and *Ultramares* are distinguishable, the view more consonant with present notions of equitable loss distribution is that which holds accountants

---

**56.** *Landell v. Lybrand*, 264 Pa. 406, 107 A. 783 (1919), the one Pennsylvania case treating the problem under consideration here, resembles *Ultramares*. In *Landell* the Pennsylvania Supreme Court denied relief against accountants to a plaintiff who had invested on the basis of a prospectus prepared by the accountants containing false information. In finding for defendant accountants the court said:

> The averment in the statement of claim is that the defendants were careless and negligent in making their report; but the plaintiff was a stranger to them and to it, and, as no duty rested upon them to him, they cannot be guilty of any negligence of which he can complain.

*Landell* is thus distinguishable from the present case in that the Royal shareholders were hardly "strangers" to Zelnick.

**310**

liable in negligence for careless financial misrepresentations relied upon by actually foreseen and limited classes of persons. 284 F.Supp. at 93. We conclude, therefore, that defendants' lack of strict privity does not preclude their claim against Zelnick when Zelnick knew of the purpose of the April 1973 audit and the use to which it would be put.[57]

 Zelnick further contends, however, that whether or not lack of privity bars defendants' recovery against it, the claim must fail because the warranty defendants made imposed a strict liability on them while Zelnick's alleged liability to defendants can only be based on concepts of negligence. We believe Zelnick misconceives its duty here and the consequences of a breach of that duty. In reliance[58] on Zelnick's work in preparing the April 1973 statement, defendants warranted that statement; Zelnick knew of defendants' reliance. Now that we have found defend-ants liable in damages to plaintiff for breach of the financial warranty, a breach resulting from mistakes in the April 1973 statement admittedly made by Zelnick, the logical and legal conclusion is that Zelnick's negligence was the proximate and foreseeable cause of defendants' injury.[59] The court in *Ryan v. Kanne*, 170 N.W.2d 395, 401 (Iowa 1969), puts the proposition this way:

> When the accountant is aware that the balance sheet to be prepared is to be used by a certain party or parties who will rely thereon in extending credit or *in assuming liability for obligations of the party audited,* the lack of privity should be no valid defense to a claim for damages due to the accountant's negligence. We know of no good reason why accountants should not accept the legal responsibility to known third parties who reasonably rely upon financial statements prepared and submitted by them.

(emphasis added). We agree.[60, 61]

---

**57.** Although there is no direct testimonial evidence on point, we infer from Zelnick's close relationship with Royal and from the fact that the Zelnick accountants worked directly with Hubert during the immediate pre-acquisition period to prepare the April 1973 statement for closing, that Zelnick was aware of the purpose of preparing the statement.

**58.** At p. 11 of its post-trial brief Zelnick argues that the failure of Lewis and Frederick Cohen to testify personally that they relied on the work of Zelnick in making the financial warranty precludes them from establishing reliance. We agree with defendants, however, that *Judson v. Peoples Bank & Trust Co.*, 25 N.J. 17, 134 A.2d 761 (1957), a case factually similar to this one, disposes of Zelnick's argument.

**59.** If the errors Zelnick made in the April 1973 statement were less obvious and mechanical than they were, we might have had to determine the scope of Zelnick's undertaking in compiling the statement. We avoid the determination here because we believe even the most restricted undertaking would impose on Zelnick a duty to multiply correctly and to make overhead deductions from inventory that can be simply computed.

**60.** Zelnick has insisted throughout this litigation that the unaudited status of the April 1973 statement should somehow relieve it from liability for its admitted failure to multiply and to deduct overhead from inventory. We cannot agree. Rather we align ourselves with the position of the court in *Ryan v. Kanne*, 170 N.W.2d 395, 404 (Iowa 1969), that

> Although in [the accounting] profession a distinction is made between certified audits where greater time and effort are expended to verify book items, and uncertified audits where greater reliance is placed on book items, it is clear to us that accountants, or any other professional persons, must perform those acts that they have agreed to do under the contract and which they claim have been done in order to make the determination set forth and presented in their report. Their liability must be dependent upon their undertaking, not their rejection of dependability. They cannot escape liability for negligence by a general statement that they disclaim its reliability.

The errors here were not subtle ones. Avoidance of them required neither a costing check nor an inventory. Under these circumstances, we make no distinction between an audited and an unaudited statement.

**61.** Although we have not analyzed the issue of Zelnick's liability to defendant Rubin and the Cohen defendants strictly in terms of a right vel non to indemnity, we would reach the same result if we undertook such an analysis. We would hold Zelnick primarily liable for the inaccuracies in the April 1973 statement and defendants only secondarily liable, such a rela-

2. *Claim of All Defendants for a Set-Off Against Their Liability of the Amount Paid in Settlement to Coleco by Zelnick*:

Plaintiff concedes that the damages sought under its contract claim and those sought under its 10b–5 claim are the same. On the basis of this concession, defendants urge that we apply New Jersey's one-satisfaction rule, *Breen v. Peck*, 28 N.J. 351, 146 A.2d 665 (1958), which holds simply that if a party's claim has been fully satisfied, he has no further claim. Under the rule, if applicable, any settlement amount is set-off against the liability of the remaining defendants.[62] Defendants do admit that there are two difficulties with applying the one-satisfaction rule in this case, first, because the settled claim was brought under Rule 10b–5 and the successful unsettled claim was brought in contract and, second, because a line of New Jersey case law collateral to the *Breen* line of cases holds that the one-satisfaction rule does not always apply. See, e. g., *Theobald v. Angelos*, 44 N.J. 228, 208 A.2d 129 (1965). We agree with defendants, however, that these difficulties should not preclude a set-off in this case. The New Jersey cases appear to focus on the identity of damages resulting from different claims, not on the identity of the legal theories supporting the claims. In fact the court in *Breen* applied the one-satisfaction rule when one claim was based on contract and one on tort. Furthermore, the reasons *Theobald* gives for not applying the one-satisfaction rule in that case do not apply here. The quantum of damages which amounts to full satisfaction is not difficult to assess here, and defendants are not "wrongdoers" in the sense that a negli-

gent tortfeasor is a wrongdoer. We conclude, therefore, that New Jersey's one-satisfaction rule should apply in this case. Since the settlement between plaintiff and Zelnick was for $350,000, a set-off of the settlement amount against the amount of damages defendants owe plaintiff reduces the amount owed to zero.

G. *Defendants' Counterclaim against Plaintiff for the Balance of the Purchase Price and for Repayment of Loans*

From the time plaintiff filed suit in December 1973, it has paid nothing to defendants under the terms of the Purchase Agreement. This means that of the total purchase price of $500,000, $350,000, plus 6% interest from May 1, 1973, and personal loans amounting to $43,334 remain unpaid. All defendants counterclaim against Coleco for these sums. Plaintiff denies their claim arguing, first, that under ¶ 8.1 of the Purchase Agreement proof of any warranty breach totally excuses all unpaid consideration including purchase price and loans and, second, that the serious nature of the breaches in this case excuses plaintiff from any future performance.

Section 8 of the Purchase Agreement begins:

The obligations of Coleco under this Agreement shall at all times be subject to the following conditions precedent, any of which may be waived by Coleco:

8.1. *Accuracy of Representations and Warranties.* The representations and warranties of the Stockholders herein contained shall be true on and as of the Closing Date except as affected by trans-

---

tionship giving rise to a right of defendants to indemnity.

**62.** Plaintiff claims at n. 20(a) of its reply brief that defendants should not be allowed to avail themselves of the one-satisfaction rule since they failed to prove on the record the consideration for the Zelnick settlement. This is not accurate. There was the following exchange between David Berger and counsel for the Cohen defendants on cross-examination:

Q. Now, there came a time in this matter, sir, when a settlement was made with one of the defendants; did there not?
A. Yes.
Q. That was with Zelnick, Sobelman and Company; is that correct?
A. Yes.
Q. And the settlement amount, as I recall, was $350,000; was it not?
A. Yes.
Tr. at 25:3179.

actions contemplated hereby and except to the extent that such representations and warranties were made as of a specified date and as to such representations and warranties, the same shall have been true as of the specified date.

Focusing exclusively on this language, plaintiff urges that we read it to preclude defendants' counterclaim. We cannot accept plaintiff's position for two reasons. First, under plaintiff's reading of ¶ 8.1, the most trivial breach could trigger the forfeiture of up to $365,000 of the purchase price. Indeed in this case plaintiff asks us to excuse the payment of that amount after having proved less than $50,000 in breach damage. Should we attribute such effect to ¶ 8.1, we would feel constrained to void it as a penalty. Second, and more significantly, when ¶ 8.1 is considered together with the rest of section 8 and other provisions of the Purchase Agreement, it becomes clear that non-breach of warranty was a condition precedent to Coleco's obligation to come to closing not to its obligation to pay the purchase price after closing.[63] The whole of section 8, entitled *Conditions Precedent to Obligations of Coleco*, contains ten subsections the particular contents of most of which make it obvious that the duties imposed are conditions precedent to closing. In isolation the import of ¶ 8.1 is perhaps not so obvious, but, when read with the rest of the list, it falls naturally into the pattern. The pattern continues into ¶ 9 of the Purchase Agreement, entitled *Conditions Precedent to Stockholders Obligations* and undoubtedly a companion provision to section 8, which imposes on Coleco an obligation obviously keyed to closing to have delivered to each Royal shareholder:

> a favorable opinion of Arnold C. Greenberg, Esq., Counsel for Coleco, dated the Closing Date and covering the matters contained in all of the Subsections of Section 5.

The first sentence of ¶ 3.1 also reinforces our interpretation of ¶ 8.1. The sentence reads:

> Unless this Agreement is terminated as herein provided, the consummation of the sale, transfer, and delivery of the Royal Shares shall take place at 2650 Haddonfield Road, Pennsauken, New Jersey, on June 4, 1973 at ten o'clock in the forenoon.

Although ¶ 3.1 does not refer directly to sections 8 and 9, they are the logical referents. Finally, interpreting ¶ 8.1 as plaintiff suggests renders meaningless ¶ 1.5 which reads:

> Coleco shall have the right to deduct from the purchase price provided for in Subsections 1.3 and 1.4 *as the same shall become due* the amount of any damages to which Coleco is entitled as a result of any breach of any of the Stockholders representations, warrants, covenants, or agreements as set forth herein.

(emphasis added). Plaintiff would simply have no need for ¶ 1.5 if ¶ 8.1 means what plaintiff says it does. We resist reading one provision of a contract so that it renders another provision superfluous, especially when an interpretation reconciling the two so clearly presents itself. In sum, then, we reject plaintiff's interpretation of ¶ 8.1 as automatically excusing it, once breach is proven, from any future performance under the Purchase Agreement.

■ In the alternative plaintiff contends that should its future performance not be excused by the terms of the Purchase Agreement, it is excused because of the materiality of the breaches proved. We must also reject this contention since, applying the tests of materiality laid down in § 275 of the Restatement of Contracts (see also Restatement (Second) of Contracts § 266 (Tent. Draft No. 8, 1973)), we conclude that the breaches we have found are not significant enough to excuse plaintiff's

---

**63.** Plaintiff contends that one cannot make this distinction because "in this instance the execution of the purchase agreement, including Paragraph 8, occurred June 4, 1973, *simultaneously* with the closing." Plaintiff's reply brief at 28.

We don't agree. The Purchase Agreement is dated May 1, 1973, and whether or not actually executed until June 4th, it obviously contemplates a hiatus between the drafting and dating of the contract and the closing date.

future performance. Section 275 of the Restatement lists the following factors for consideration in determining the materiality of a breach:

(a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;

(d) The greater or less hardship on the party failing to perform in terminating the contract;

(e) The wilful, negligent or innocent behavior of the party failing to perform;

(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract.

Given plaintiff's pre-acquisition knowledge, through Glassman and Schwefel, of both the Royal strengths and the Royal weaknesses, the limited amount of breach damage proved in proportion to the amount of the purchase price plaintiff wishes to avoid, defendants' performance in delivering Royal, and defendants good faith dealing, we conclude, influenced most heavily by factors (a) through (e) of § 275, that defendants' breaches are not so material either singly or in combination as to excuse plaintiff's performance. Plaintiff is therefore liable to defendants, on the Purchase Agreement,

for the balance of the purchase price and for the unpaid loans.

**H. Claims of Breach of Defendant Berman's and Defendant Rubin's Employment Contracts**

One of the conditions under which plaintiff purchased Royal was that Berman and Rubin execute three-year employment contracts with Royal and continue to run it. Coleco's reasons for making such a condition were admittedly to acquire Berman's and Rubin's talents, highly rated by Coleco management, and inferentially to neutralize two effective competitors.[64] The employment contracts, appended to the Purchase Agreement and executed at the same time as the Purchase Agreement, obviously contemplated that Berman and Rubin would serve in highly responsible executive and managerial positions with Royal. This intention is reflected in the description of Berman's and Rubin's duties in ¶ 2 of the employment contract:

Your duties in the first instance shall be substantially similar to those performed by you for ROYAL during 1972 and 1973. Such duties shall include active responsibility for ROYAL's sales force and marketing organization, for ROYAL's manufacturing operations and for directing ROYAL's product development activity. Your duties may also include from time to time such other reasonable executive responsibilities as relate to ROYAL as may be assigned to you by the Board of Directors of ROYAL or by the President, Senior Vice President or Executive Vice President of COLECO INDUSTRIES, INC.

---

**64.** The employment contracts themselves both contain the following provision:

For a period of two years after expiration or termination for any reason whatsoever of your employment by ROYAL, you will not directly or indirectly own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be an employee or an independent contractor with respect to, or be connected in any manner with, any business, whether owned by an individual, corporation, partnership or any other entity, which (a) manufactures or sells

anywhere in the United States of America products reasonably similar to those manufactured or sold by ROYAL or * at the time of such expiration or termination of said employment; or (b) renders services or engages in activities anywhere in the United States of America substantially similar to those rendered and engaged in by ROYAL at the time of such expiration or termination of said employment. . . .

¶ 8. And, in fact, in the letter of termination to Berman (Ex. 146), plaintiff reminds him of this provision.

In return for competent performance of duties, Rubin and Berman were to receive set salaries plus a bonus on each "deluxe pool" sold, with "deluxe pool" defined as "any pool ROYAL sells for $1000 or more." Both sides now claim breach of the employment contracts.

Although the standard in New Jersey by which one judges a claim of breach of an employment contract is easily stated, we find it not easily applied to the facts of this case. All parties agree that

> Misconduct prejudicial to a master's interest is good cause for discharge, but the misconduct must be gross, e. g., insubordination, exerting a bad influence over other servants, producing injury to the employer's business.

*Sawyer v. E. F. Drew and Co.,* 111 F.Supp. 1, 2 (D.N.J.1953). In applying this standard to defendant Berman and to his acquittal of his duties during the Summer of 1973, we conclude, reluctantly, that he did breach his employment contract and that plaintiff had legal cause to discharge him. We wish to make clear, however, both the facts upon which we base this conclusion and those upon which we do not base it. Berman was a salesman, a good one; he was not a production man. We do not believe his refusal to help Rubin in the factory or his initial reluctance to work on the inventory constituted a dereliction of duty. Nor can we find that he was not spending sufficient time on sales and in attempting to collect receivables. In the first place, Royal's problem was a glut of sales orders coupled with a dearth of pools to fill these orders; in the second place, the older receivables were highly difficult to collect because Royal was not delivering on its newer orders. There is a combination of facts, however, that persuades us that Berman did not fulfill his contract. Although Berman had no duty to engage in what would have been essentially a waste of his time trying to help out in the factory, he did have a duty to help Rubin where he could with the office work so that Rubin would be freer to deal with those aspects of the business that only he could handle. We have credited Rubin's testimony that Berman was remiss in this area and, particularly, that "Berman never Credited dealers on returns. He never Debited suppliers on returns. Generally the office work was a disaster." Ex. R–35 at 4. In addition, Berman's having told Rubin that "he will do what he wants and let Coleco fire him then he will sue," bespeaks an attitude, albeit one born out of frustration and developed under severe working pressure, that would obviously not redound to his employer's benefit. For whatever reason, Berman also prepared an unrealistic, and therefore unacceptable, 1974 sales projection for presentation at a July meeting in Hartford, a significant failure for an employee in Berman's position. Finally, Berman simply left Royal for a few weeks in August, one of the three or four crucial months in the pool selling industry. During the time he was gone he missed an important executive meeting in Hartford. Although we credit Berman's testimony that his August leave was precipitated by his distress over the restrictions Coleco was imposing on him and over intense business pressures in general, we believe that Berman's unilateral decision, without notifying Coleco, to abandon his duties at Royal at the time and for the duration he did was a serious dereliction of duty.[65] Although we sympathize with Mr. Berman's situation during the Summer of 1973, we conclude that having accepted from Coleco the executive and managerial position which he did, he had an obligation to Coleco to withstand the pressures of the business turmoil in which he found himself. In sum, while the burden on an employer to prove breach of an employment contract is a substantial one under New Jersey law, we hold that on the facts as we have found them, plaintiff has

---

**65.** Possibly medical evidence documenting Berman's psychological and physical condition in July and August 1973 would have been relevant on the issue of his breach of his employment contract. Although Berman's counsel had some thought of offering such evidence, we precluded him from doing so for failure fairly to comply with discovery requests. Tr. at 1:25–27.

carried its burden and defendant Berman's claim must fail.[66]

 In moving to defendant Rubin's claim, we note preliminarily that his performance during the Summer of 1973, in contrast to Berman's, was well above and beyond the call of duty. He worked long days seven days a week most of the Summer, without the help he had been promised and able to deal directly only with Schwefel and Hubert. The difficulty with Rubin's claim, then, is not with his quality of performance but with the fact that he was not discharged; he resigned. At no time did Coleco either cut off his salary or threaten to do so, and, in fact, top members of the Coleco management told him they wanted him to stay on at Royal. After considering Rubin's situation in November 1973, however, we conclude that there are other ways to breach an employee's contract besides actually discharging him without cause and that plaintiff is indeed liable to Rubin for breach of his employment contract. Although the facts in *Atlantic City v. Farmers Supply and Products Co.*, 96 N.J.L. 504, 508, 115 A. 388 (1921), are distinguishable from the ones presented here,[67] we believe applicable to this case the following principle of law laid down by the *Atlantic City* court:

> Where a contract obliges one party to perform it, and its performance, within the intention of the parties, requires the performance of a correlative obligation by the other party, such obligation will be implied.

Here we conclude that Coleco had an obligation to cooperate with Rubin so that he could perform his contractual duty to manage Royal. Given Rubin's high competence in designing and producing pools, the talent for which he was hired, Coleco had an obligation to allow him to exercise that competence to insure the success of a business in which he had both a psychological and financial stake. Instead, Coleco denied his requests for personnel and cash for suppliers, refused to communicate with him, issued orders to his subordinates at Royal without consulting him, and made decisions affecting Royal, such as the use of the Royal name by Abco, without consulting him. Discharge is not an employer's only way of separating itself from an employee. Finally, we conclude that Coleco's avowed intention of moving most of Royal's production to Connecticut breached ¶ 3 of its employment agreement with Rubin which reads in part:

> In the event that it is determined during the term of this Agreement to relocate ROYAL's business, the parties agree that said relocation will be within a radius of thirty (30) miles from ROYAL's present location.

It appears that rather than Rubin's leaving Royal, Royal, in most material respects, left Rubin. We hold, therefore, that Coleco breached Rubin's employment contract and is liable to Rubin for $70,506.80 representing the salary due him under the contract.[68] We further hold, however, that Rubin has not carried his burden of proving with reasonable certainty that plaintiff is liable to

---

66. Our conclusion that Berman breached his employment agreement does not affect our earlier conclusions that defendants did not totally breach the Purchase Agreement and that their contract breaches did not cause plaintiff to suffer over a million dollars in damages. First, we note that the Purchase Agreement itself specified the damages which were to flow from a breach of one of the employment contracts. Paragraph 1.4(d)(ii) reads in part:

> In the event that either Berman or Rubin voluntarily terminate his employment with Royal, or his employment is terminated for legal cause, forty percent . . . of any sums due the Stockholders pursuant to Subsection 1.4(d)(i) (providing for payment of the contingent purchase price) shall be for-

feited and not paid for any period that either employee . . . has not been continuously employed by Royal.

Second, Berman's breach of his employment contract, even in combination with any other breaches we have found, did not render Royal valueless and did not cause its failure.

67. One immediate factual distinction is that the contract in *Atlantic City* was not an employment contract but a contract between Atlantic City and an independent contractor.

68. This figure includes a deduction for employment earnings from other sources during the contract period. Ex. 379A.

him in the amount of $7,440 representing the bonus on 1488 pools sold in 1973 and 1974. Rubin's evidence consists solely of his testimony that to his knowledge Royal sold no pools in 1973 for under $1000 and that he had seen Abco's 1974 price list for Royal pools on which no pool was listed for under $1000. Tr. at 24:3132–33 and 24:3133–34. He also testified, however, that Royal gave volume discounts, that Berman handled these discounts, and that he could have been unaware of the discounts given. Tr. at 24:3139. Finally, he testified that he was unaware of Abco's discounting practices in 1974. Based on this evidence, we conclude that Rubin has not carried his burden of demonstrating with reasonable certainty any particular amount of damage. Although he has established the fact of damage and this may allow us to lower the standard of reasonable certainty, to some degree, in assessing an amount of damage, we find that the evidence permits us only to speculate as to the number of pools out of the 1488 pools sold for under $1000. We know neither how frequently Berman or Abco gave volume discounts nor how frequently this practice might have reduced the cost of an individual pool to less than $1000. It does not appear improbable, for instance, that Castle pools, priced as they were at the lower end of the Royal line, might have been discounted to less than $1000 a pool.

I. *Uncollected Accounts Receivable*

█ Coleco's employees testified that as of the time of trial, $30,000 of Royal's accounts receivable were yet uncollected. Although this amount does not qualify as damages for breach, plaintiff claims it still is due it under ¶ 6 of the Purchase Agreement which provides in part:

The Stockholders shall cause Royal to take all reasonable steps to collect the accounts receivable of Royal as at April 30, 1973. If twelve (12) months after the Closing Date any of the accounts receivable of Royal as at April 30, 1973 are then unpaid, Coleco shall have the right to claim a reduction in the Purchase Price equal to the amount of such unpaid

accounts receivable which exceed the reserve set forth in the balance sheet as at April 30, 1973.

The reserve was $5000. Defendants urge that we reject this claim for plaintiff's failure to comply with the procedure reasonably contemplated by ¶ 6. Cohen defendants' post-trial brief at 12–13. We will heed defendants' urgings. Paragraph 6.1 provides for a reduction in the purchase price to cover uncollected accounts receivable. Such a remedy would now be impossible if all contract terms had been complied with since the purchase price would be completely paid. Paragraph 6.2 provides:

In the event that Coleco shall claim a reduction in the Purchase Price as provided in Article 6.1, upon payment of such amount to Coleco, Coleco shall cause Royal to assign the account or accounts receivable to the Stockholders.

We conclude that a fair reading of ¶ 6 is that Coleco had an obligation to initiate reassignment of the accounts receivable under ¶ 6.2 within a reasonable time after June 4, 1974. Waiting to claim them under this judgment has placed defendants in the virtually impossible position of attempting to collect accounts more than three years old. We deny the claim.

J. *Attorneys' Fees and Costs*

█ Under ¶ 14 of the Purchase Agreement entitled *Indemnification of Stockholders* defendants agreed to "indemnify and hold Coleco harmless against":

14.2 All damages or deficiencies resulting from the inaccuracy or breach of any representation, warranty or agreement set forth in this Agreement or in any schedule, certificate, list or other instrument delivered by Stockholders, whether made as of the date hereof or as of the Closing Date or otherwise.

14.3 All actions, suits, judgments, costs and expenses incident to any of the foregoing, including legal fees and reasonable costs of investigation.

Under this provision plaintiff claims $410,-550.27 in legal fees and costs billed to it up to March 13, 1976. Included in this amount

are approximately $64,387 in costs, $250,-153.29 in fees to David Berger, P.A. (David Berger), for 3445 attorney hours worked, $34,237.50 in fees to David Berger for 1369 and ½ non-attorney [69] hours worked, and $61,772.96 in fees to David Berger for 850 and ¾ hours worked by the Washington, D. C., firm of Yablonski, Both, and Edelman hired by David Berger to participate in the post-trial briefing. Affidavit of James Hubert, Doc. # 291, as modified and further detailed by Affidavit of David Berger, Doc. # 293, ¶¶ 5 and 37. Although we are influenced in our approach to the issue of attorneys' fees by principles laid down by the Court of Appeals for the Third Circuit in the *Lindy* cases, *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973), and *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir. 1976), we believe these cases, involving the judicial award of attorneys' fees, only indirectly applicable to this case involving the recovery of attorneys' fees and costs as an item of damage under a contract. Directly applicable is *Cohen v. Fair Lawn Dairies,* 86 N.J.Super. 206, 206 A.2d 585, *aff'd,* 44 N.J. 450, 210 A.2d 73 (1965), in which a New Jersey appellate court enforced an attorneys' fees provision in a contract holding that it does not violate New Jersey public policy for

> a party to a written agreement [to] bind himself, by express stipulation therein, to liability to the other for the reasonable legal expense of maintaining an action for breach of the agreement as part of the recoverable damages in the event of such breach.

86 N.J.Super. at 208, 206 A.2d at 586. The court further held such a recovery of attorneys' fees was simply another item of damages to be proved as any other item of damages. *Id.* at 216, 206 A.2d 585. Finally, in addition to requiring that any attorneys' fees recovered under contract be reasonable and necessary, the court went on to recommend to the trial court on remand the following qualifications on recovery of con-

tractual attorneys' fees noted by the Court of Appeals for the District of Columbia Circuit in *Manchester Gardens v. Great West Life Assurance Co.,* 92 U.S.App.D.C. 320, 205 F.2d 872 (1953):

> "Similarly, where the merit or necessity of the creditor's claim or defense is successfully challenged, courts may decline to enforce attorney's fee provisions. When contractual provisions for payment by a debtor of his creditor's attorney's fees and costs are invoked, such payment should not be enforced in the full amount of the creditor's legal expenses (even though actually incurred, and reasonable in amount) where his claims or defenses giving rise to such expenses lack substantial merit. In no event should the sum allowed be so large as to amount to an undue penalty for taking one's grievance to the courts."

86 N.J.Super. 216–17, 206 A.2d 590, *quoting,* 205 F.2d at 878.

In approaching, under the guidance of *Cohen,* what has been a particularly difficult problem for us, we begin with defendants' contention that ¶ 14 of the Purchase Agreement provides for attorneys' fees only in actions involving plaintiff and third parties and that it does not expressly enough provide for attorneys' fees in an action between the parties to the Purchase Agreement. We cannot accept this contention. While *Cohen* requires an "express stipulation" and while the contractual provision in *Cohen* is more detailed than the one under consideration here, we conclude that the express terms of ¶ 14.2 and 14.3 read together provide for attorneys' fees in this action. Paragraph 14.2 indemnifies Coleco against "*[a]ll* damages . . . resulting from the inaccuracy or breach of any representation, warranty or agreement set forth in this Agreement"; paragraph 14.3 explicitly includes in the items against which defendants indemnify plaintiff "*[a]ll . . . suits . . . incident to any* of the foregoing, including legal fees and reasonable costs of investigation (emphasis added)." Although this language is broader and more

---

**69.** Non-attorneys include law clerks and paralegals.

general than that of the contractual provision in *Cohen,* we consider it no less express. It is quite similar to the provision enforced in *Manchester Gardens* which required the mortgagor to pay:

"All costs and expenses and attorney's fees . . . of the Trustee and of the Beneficiary [mortgagee] in case of *any* litigation *involving* this property."

205 F.2d at 876 (emphasis added).

Next we confront the question of whether or not plaintiff has proved, as an item of damages, a *reasonable* attorneys' fee.[70] We note here that we have considered the concept of reasonableness from two vantage points in reaching our determination on attorneys' fees. We considered, first, the reasonableness of the amount claimed focusing narrowly on the hourly rates charged plaintiff and the number of hours claimed. Then we considered the reasonableness of

the amount claimed focusing broadly on notions of public policy and fairness. Record evidence on the issue of attorneys' fees consists of trial testimony by David Berger (Tr. at 25:3170–3235) and affidavits submitted by David Berger, James Hubert, and Theodore Mann, attorney for the Cohen defendants. Although we reopened the trial record for a hearing on the issue of attorneys' fees on June 11, 1976, counsel after brief argument elected to stand on the evidence already presented.[71] The agreement between plaintiff and David Berger, never reduced to writing, provided both for payment of costs and hourly rates and a contingency. Tr. at 25:3171–72. Under this contract plaintiff now claims $410,-550.27 including fees for 5665 and ¼ hours of attorney and non-attorney work and $64,386.52 for costs. While we do not believe we have as high a duty, in finding

**70.** In approaching the concept of reasonableness, we note that in *Cohen* the attorneys' fees provision itself used the word "reasonable" to modify the term "counsel fees." In the present case the term "legal fees" is unmodified although the term "costs of investigation" is modified by "reasonable." In view of what we perceive to be the clear message of the *Cohen* court, however, we reject any inference that this discrepancy would allow us to award *unreasonable* attorneys' fees, even under contract. First, the *Cohen* court's initial identification of the general issue in the case, made before it considered the particular contractual provision in question, couches the problem in terms of whether or not "reasonable legal expense" may be provided for contractually. 86 N.J.Super. at 208, 206 A.2d 585. Second, although the court discusses the issue throughout the opinion in terms of "reasonable" fees, it never links the requirement of reasonableness to the use of the word "reasonable" in the contract provision. Finally, the broader policy justifications for limiting contractual attorneys' fees invoked at the end of the *Cohen* opinion apply in some instances even to fees "actually incurred, and reasonable in amount." 86 N.J. Super. 116–17, 206 A.2d 590. They must obviously, then, apply to unreasonable fees.

**71.** Although the *Cohen* court instructed the trial court that on remand, more would be required to prove reasonable attorneys' fees than ex parte affidavits, the New Jersey Supreme Court in affirming the appellate court did modify this requirement holding that, in the absence of objection by opposing counsel to proof by affidavit,

there would generally be no reason for requiring plenary proof, provided the record before the trial court, including the affidavit of services, is sufficiently complete to enable it to reach a fair determination as to the extent of legal services rendered and the reasonable value to be paid pursuant to the contractual provision.

44 N.J. at 452, 210 A.2d at 74. While opposing counsel in this action did file a counter-affidavit assailing the reasonableness of the attorney hours claimed, he did not object to the affidavit procedure. To be certain, however, that all parties, deeply involved during trial with the substantive issues of the case, had placed in the record all evidence they desired on the issue of attorneys' fees, we reopened the record on June 11, 1976. Again no objection was raised to the affidavit procedure, and the parties elected to stand on evidence already in the record.

Since we did not in Section I of this Opinion make factual findings on the issue of attorneys' fees, we now credit the factual representations in the various affidavits as to the hours devoted to this litigation, the hourly rates charged, and the total amount in fees and costs billed to plaintiff by David Berger. We also credit David Berger's representation that the firm devoted 67% of its time to the contract action up to December 10, 1975, when we dismissed the federal securities and common law fraud claims against the Cohen defendants, and 80–85% of its time to the contract claim thereafter. Affidavit of David Berger, ¶¶ 35–37.

counsel fees under a contract, to scrutinize a law firm's handling of a litigation as we do when awarding counsel fees out of a common fund or under statute, the *Cohen* court, through its repeated emphasis on *reasonable* counsel fees, signals us clearly that our duty under New Jersey law goes beyond checking the record for statistical evidence of the number of hours a firm worked on a case, its hourly rate, and the bill it sent its client. We have, therefore, attempted our own breakdown of the $410,-550 claimed to determine the reasonableness of the hourly rates charged and the number of hours devoted to this litigation.

David Berger testified that under his fee arrangement with plaintiff, his firm charged a flat rate of $75 an hour for attorney hours and $25 an hour for non-attorney hours. Tr. at 25:3171A. Actually, dividing attorneys' fees claimed by attorney hours claimed, the precise hourly rate works out to $72.61.[72] Multiplying the hours spent by Berger's own firm by $72.61 and $25 yields a total of $284,390. Since our immediate reaction to Berger's flat rate method of billing was that it might produce excessive fees, we made an alternate computation by setting individual hourly rates for each Berger attorney based on the information on each attorney's experience and qualifications documented in David Berger's affidavit.[73] The figure we arrived at was only $30,000 less than the figure reached when one simply multiplies the number of hours by $72.61 per hour. Considering the total amount claimed and that the fees and costs recovery arises from contract, we conclude that in this case David Berger's flat rate method of billing is not, in itself, unreasonable.

 We have much more difficulty with the claim of 1324 and ¼ attorney hours devoted to post-trial work including 850 and ¾ hours logged by the Washington firm of Yablonski, Both, and Edelman. We cannot but conclude that this number of hours devoted to the post-trial period is unreasonable. Accepting the representation in the Berger affidavit that these hours were spent from January 30, 1976, through March 13, 1976 (Berger Affidavit at ¶ 37), this would mean, by one standard of measure, that the post-trial work required the

---

72. While we are unwilling to discredit the representations of Coleco and David Berger, P.A., as to the total amount of plaintiff's legal expense, we are disturbed by the following inconsistency in the record. At trial David Berger testified that his firm billed Coleco a flat rate of $75 an hour for all attorney hours. In a letter to the court, dated April 14, 1976 (Doc. # 290), however, Berger states that the total billing for attorneys and non-attorneys is $346,163.75 as of March 13, 1976; he then accounts for the amount attributable to non-attorney hours. Finally, he states:

> The balance of professional services billed, $311,926.25, covers only attorneys' hours and *works out to* an hourly rate of $70.27.

(emphasis added). We are more than a little puzzled, especially in view of the testimony that the billing rate was $75 an hour for all attorneys, by this "backing into" a figure. If the firm simply charges $75 an hour for all attorneys, why does not the total billing reflect this more precisely? We, in turn, arrived at the figure of $72.61 an hour by "backing into" it after we received David Berger's affidavit of June 2, 1976 (Doc. # 293), ¶ 5 of which reads in part:

> The 4,439¼ total number of attorney hours of plaintiff's counsel devoted to this case through March 13, 1976, set forth in the Hu-

bert affidavit was inadvertently overstated by 143½ hours. The correct total of attorney hours as of March 13, 1976, was 4,295¾. . . . The total billings for professional fees including the hours of attorneys, law clerks and paralegals through March 13, 1976 are at least $346,163.75, as set forth in the Hubert Affidavit.

Thus the billing total remains constant and the hourly rate appears to be determinable only after the fact. Were we in a *Lindy* context here, we would pursue further this inconsistency.

73. We set the following individual hourly rates:

| | |
|---|---|
| David Berger | $150 |
| Richard Sprague | $125 |
| Harold Berger | $100 |
| Leonard Barrack | $65 |
| Gerald Rodos | $55 |
| Michael Simon | $45 |
| Edward Rubenstone | $45 |
| Robert Balter | $40 |
| Other Members of Firm | $40 |

Cf. *Entin v. Barg,* 412 F.Supp. 508, 517 (E.D.Pa. 1976). *In re Penn Central Securities Litigation,* 416 F.Supp. 907, at 922 (E.D.Pa.1976).

efforts of three attorneys working ten hours a day seven days a week for 44 days. We appreciate that plaintiff's post-trial filings, including proposed findings of fact, proposed conclusions of law, and post-trial brief, were very substantial if not elaborate, but we cannot conclude it reasonable to devote 1324 and ¼ hours to post-trial work in this case. We note especially that we believe it highly unreasonable and time-consuming to contract out the bulk of the post-trial work to another law firm unfamiliar with the case.[74] Taking our measure from the affidavit of Theodore Mann, counsel for the Cohen defendants, attesting that the firm of Mann & Ungar devoted 168 hours to the post-trial briefing, we find a reasonable number of hours for plaintiff's attorneys to have spent to be 336 hours. We double the 168 hour figure since the firm of Mann & Ungar worked only on the contract claim post-trial and had less ground to cover than did plaintiff's attorneys.[75] We note, however, that Mann & Ungar's post-trial work was of a very high quality. Since the Berger office claims 1324 and ¼ hours post-trial of which 473 and ½ were logged by Berger's own people, we will simply deny any recovery for the 850 and ¾ hours logged by the Yablonski firm and conclude that 336 hours X $72.61 or $24,397 is a reasonable fee for Berger attorney hours post-trial. We will not quarrel with the claim of 2971 and ½ hours for pre-trial and trial hours logged amounting to $215,760.61. The case was filed almost two years before it came to trial, and pre-trial discovery and motion filing were substantial and steady. Since we credit the representation in the Berger Affidavit that 67% of attorney and non-attorney effort up to Dec. 10, 1975, and 80–85% thereafter, was devoted to the contract claim, we will, in arriving at the total below, multiply the total of fees and costs which we have thus far allowed by 70% to arrive at the total

attributable to the contract claim. We conclude, then, considering only the reasonableness of the rates charged and hours devoted to this litigation, that the following total is a reasonable one:

| | |
|---|---|
| Attorney hours pre-trial and trial | $215,760.61 |
| Attorney hours post-trial | 24,397.00 |
| Non-attorney hours | 34,237.50 |
| Costs | 64,386.52 |
| Preliminary Total | $338,781.63 |
| | × .70 |
| Final Total | $237,147.14 |

 Had plaintiff's recovery for breach of contract been in the general area of the more than $1 million it claimed under its enterprise theory of liability, we would have found plaintiff entitled to recover this total of $237,147.14 in attorneys' fees and costs under ¶ 14 of the Purchase Agreement. The agreement was not an adhesion contract, and the sides, each represented by its own attorneys, were of roughly equal bargaining power. Furthermore, had plaintiff succeeded on its enterprise theory, we would necessarily have found no validity to defendants' counterclaims. Plaintiff has recovered $45,000, however, for the breach of one warranty; defendants, on the other hand, have recovered together more than $500,000. Heeding, once again, what we believe a clear admonition from the *Cohen* court, we arrive at the admittedly drastic conclusion that plaintiff's recovery of attorneys' fees and costs in this action, even though under contract, must be limited to $15,000. This conclusion is based on our conviction that to allow a greater recovery under the circumstances of this case would do violence to that which was in the reasonable contemplation of the parties at the time of contracting and unfairly impede defendants' access to the courts.

Although the precise import of the fees and costs provision before us is reached only

---

74. Such a course of conduct is even more unreasonable when one considers that plaintiff had two attorneys present and intimately familiar with the case each day during trial, and from December 11 or 12, 1975, to late January 1976 most trial days saw three attorneys at plaintiff's counsel table.

75. In doubling the 168 hours we are admittedly being generous to plaintiff since we credit plaintiff's representation that 85% of attorney effort post-trial was devoted to the contract claim.

by reading together ¶ 14.2 and 3 of the Purchase Agreement, we feel a fair excerpting and combining of these subsections yields the following reading:

The Stockholders jointly and severally indemnify and hold Coleco harmless against

. . .:

legal fees and reasonable costs of investigation/
incident to/
breach . . . of any . . . warranty. . . .

This language raises the following questions: what, for present purposes, constitutes a breach and what are "legal fees and reasonable costs of investigation" "incident to" breach? In attempting to answer these questions to our satisfaction, we adopted the admittedly imperfect technique of posing to ourselves and then resolving two hypothetical cases. First, if a plaintiff claims $1 million in damages for a single breach of contract and incurs legal expenses of $237,000 in attempting to prove that breach, yet after trial on the merits fails to prove any breach, to what amount of contractual fees and costs he is entitled? Our answer is none—based on a conclusion that the term "breach" as used in ¶ 14.2 and referred back to in ¶ 14.3 must mean a judicially established breach. If plaintiff proves no breach, then there is nothing for legal expenses to be "incident to" and therefore no legal expenses due under the contract. Second, if a plaintiff claims ten discrete breaches (breach A through breach J) of the same contract with discrete amounts of damage flowing from each breach and totaling $1 million and incurs legal expenses of $237,000 in attempting to prove the ten breaches, yet proves only breach A, a $50,000 breach, to what amount of contractual fees and costs is he entitled? We think there are two possible resolutions to this hypothetical case. If plaintiff is able to identify the portion of the $237,000 expended in legal fees and costs attributable to proving the $50,000 breach, we would award as damages under the contract any figure presented that represented a fair percentage of the recovery, perhaps even

more than 50% of the recovery if the breach proved were a particularly difficult one to establish. If plaintiff could not offer any guidance, we would have to determine and award a fair percentage of the recovery as reasonable legal expense. Again the principle that we derive from this second hypothetical is that reasonable legal expense incident to breach is expense incident to judicially determined breach only. In other words, a plaintiff both successful in proving some breaches and unsuccessful in proving others may recover only those legal expenses reasonably attributable to the judicially determined breaches. We think that the present case, although somewhat different, is not distinguishable from the case in our second hypothetical. Here, rather than suing for a series of separate breaches and proving only one, plaintiff sued for more than $1 million in damages for an alleged single but "total" breach and proved only a $50,000 partial breach. In short plaintiff gambled its case almost completely on its enterprise theory of liability, an ambitious but, upon the facts of this case some of which must have known to plaintiff early on, a risky and tenuous theory. The gamble failed. We simply do not believe it in the reasonable contemplation of the parties to the Purchase Agreement at the time of contracting that, in indemnifying Coleco against legal expense incident to breach, defendants assumed the risk that Coleco or its attorneys would view such indemnification as an invitation to "shoot for the moon" in developing and presenting legal theories with defendants' underwriting legal expenses whether or not the shot was successful. Defendants assumed the risk only of plaintiff's success, not its failure. Since plaintiff was unsuccessful and absent any guidance from plaintiff, we conclude that the reasonable legal expense incident to the breach here established is $15,000. In settling on this figure, we were influenced by two considerations. First, we noted that had plaintiff been successful on its claim, it would have recovered somewhere between $1,000,000 and $1,250,000 in damages; the $237,000, which we earlier computed as the total of reasonable fees and

costs attributable to the entire contract claim, would have amounted roughly to 20–25% of the recovery. Second, we considered the ease with which plaintiff's attorneys must have uncovered the rather simple accounting errors amounting to approximately $50,000 in the April 1973 financial statement and the defendants' concession at trial of the breach which these errors represented.

▮▮▮ Aside from the limitation on fees and costs we find imposed by the contractual language itself, we believe that to allow a greater recovery than we have in this action, which might well have been brought by defendants who had vindicated substantial claims here, would discourage access to the courts of parties in defendants' positions. As a matter of policy we conclude that defendants, in contracting to indemnify plaintiff against attorneys' fees and costs generated by legal disputes over defendants' breach of the Purchase Agreement, accepted only the risk that fees and costs would be generated reasonably proportional to the amount of breach damage they had caused. Otherwise there would be added an unfair pressure on defendants to settle out of court even when they had substantial defenses or counterclaims. The Cohen court, quoting the Court of Appeals for the District of Columbia Circuit, warns explicitly:

> In no event should the sum allowed be so large as to amount to an undue penalty for taking one's grievance to court.

To allow plaintiff's recovery of fees and costs beyond a reasonable amount based on the amount recovered for breach would constitute an "undue penalty" on defendants for bringing their claims to court. This, we infer from Cohen, would contravene the public policy of the State of New Jersey and would certainly shock the conscience of this court. We must limit plaintiff's damage recovery for fees and costs, therefore, to $15,000. We will not, however, set off

the $350,000 Zelnick settlement against this figure of $15,000. Although the $45,000 warranty breach recovery is identical to at least part of that which might have been recovered under the securities claim against Zelnick, *Janigan v. Taylor,* 344 F.2d 781 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), there was no claim for attorneys' fees under the section 10(b) claim. Under these circumstances we do not think it proper to set off the settlement against defendants' liability for contractual attorneys' fees and costs.

### K. Interest

To resolve the award of interest, we are concerned with two separate time periods: first, the period during which the parties provided for contractual interest on the balance of the unpaid purchase price, and second, the period commencing with the date on which payment of the principal and interest was due under the Purchase Agreement until the date of the judgment order.

▮▮▮ Under New Jersey law, contractual interest "is the compensation fixed by the parties for the use, detention or forbearance of money or its equivalent. Since it is grounded on contract being 'part of the bargain that was struck when the loan was made,' it is recoverable as of right along with principal." *Deerhurst Estates v. Meadow Houses, Inc.,* 64 N.J.Super. 134, 154, 165 A.2d 543, 554 (1960) (citations omitted). Under the Purchase Agreement, the parties provided that $135,000 of the $500,000 non-contingent purchase price was to be paid at closing and the balance was to be paid in 3 installments with interest on the unpaid balance from May 1, 1973 at the rate of 6% per annum payable with each installment.[76] We find that the parties intended that interest accrue only until the dates set for payment of the installments under the Purchase Agreement, and we conclude that the defendants are entitled to 6% interest on the unpaid balance of the

---

**76.** The Purchase Agreement provided for a non-contingent purchase price of $500,000 with $135,000 to be paid on the settlement date of May 1, 1973. The balance of the purchase price was to be paid in installments according to the following schedule: $57,500 payable on January 2, 1974; $57,500 payable on January 2, 1975; and the final $250,000 was payable on January 2, 1976. Each installment was to be paid with 6% interest from May 1, 1973.

purchase price and this interest will accrue until the dates set for payment of the installments in the Purchase Agreement.

The second time period runs from the date the installments were due under the Purchase Agreement until the date judgment is entered. The issue here is whether defendants are entitled to prejudgment interest. Under New Jersey law, "the rule appears to be that, unless considerations of justice and fair dealing clearly demand a different result, [prejudgment] 'interest should not be allowed where the damages are unliquidated and not capable of ascertainment by mere computation or where a serious and substantial controversy exists as to the amount due under the contract.'" *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 723 (3d Cir. 1971), quoting *Jardine Estates, Inc. v. Donna Brook Corp.*, 42 N.J.Super. 332, 341, 126 A.2d 372, 377 (App.Div. 1956). If the amount is not disputed, then prejudgment interest may be awarded to the aggrieved party notwithstanding a good faith belief or colorable claim by the breaching party that an obligation did not exist to pay the liquidated amount.[77] *See Jos. L. Muscarelle, Inc. v. Central Iron Mfg. Co.*, 379 F.2d 715 (3d Cir. 1967); *Rova Farms Resort v. Investors Insurance Co.*, 65 N.J. 474, 506, 323 A.2d 495, 512 (1974); *Kamens v. Fortugno*, 108 N.J.Super. 544, 262 A.2d 11 (Chanc.Div. 1970). It is clear that although there were numerous disputes as to legal liability under the Purchase Agreement the amounts due the defendants under the Purchase Agreement were never contested. Accordingly prejudgment interest will be awarded on the balance of the unpaid purchase price. This interest will run from the dates on which the installments were payable pursuant to the Purchase Agreement until the date judgment is entered. Further we conclude that the same rationale with regard to prejudgment interest should apply to the salary payable to Mr. Rubin and the loan repayments due all defendants. The interest due on these claims also will run from the dates they were payable to defendants to the date of judgment.

Also we must determine the interest rate for prejudgment interest. The New Jersey Rules of Civil Practice provide that judgments shall bear interest at the rate of 8% per annum.[78] N.J.Civ.Proc. R. 4:42–1(a). However, this rate is not mandatory, and the Court may deem it "proper to allow the contractual rate of interest to continue in effect until judgment." *Mid-Jersey National Bank v. Fidelity Mortgage Investors*, 518 F.2d 640, 645 (3d Cir. 1975). Under the Purchase Agreement the parties determined that 6% was an appropriate rate of compensation for use of the money, and thus we order that all prejudgment interest be calculated at 6%.

And finally we shall include prejudgment interest and contractual interest in the judgment for purposes of computing post-judgment interest. *Magee v. Ford Motor Co.*, 132 N.J. Super. 565, 334 A.2d 382 (Law Div. 1975).[79]

---

77. This proposition has been bolstered by the New Jersey Supreme Court's recent view that interest is not punitive, but rather should be viewed as compensation for the use of the money while it was withheld by the breaching party. *Rova Farms Resort, Inc. v. Investors Insurance Co.*, 65 N.J. 474, 516, 323 A.2d 495, 572 (1974).

78. It is not altogether clear whether Rule 4:42–1(a) was meant to provide the rate for prejudgment interest. The rule provides in pertinent part:

Judgments, awards and orders for the payment of money and taxed costs shall bear interest on the amount of the award at 8% per annum *from the date of entry*, except as otherwise ordered by the court.

N.J.Civ.Proc. R. 4:42–11 (emphasis added). We conclude that the language "from the date of entry" makes it unclear whether the rule was meant to be applied to prejudgment interest. However, our holding that the parties contractual interest rate is the most appropriate interest rate makes it unnecessary for us to construe this language definitively.

79. At the time of closing the Cohens and Rubin and Berman executed a side agreement (Ex. 397) by which Rubin and Berman indemnified the Cohens against damages for which defendants might become liable for breach of the financial warranty. Since we have concluded in section IIF(2) that the liability of all defendants for such breach reduces to zero when the Zelnick settlement is set off against it, we need

**324**

## ORDER

NOW, December 21, 1976, pursuant to the remand from the United States Court of Appeals for the Third Circuit, IT IS ORDERED that our Order of August 9, 1976 is amended in accordance with revised paragraph K of our Opinion, to read as follows:

1. These judgments are entered as of August 9, 1976.

2. Judgment is entered for plaintiff and against all defendants in the amount of $15,000.00.

3. Judgment is entered for defendant Berman and against plaintiff in the amount of $160,778.93 determined as follows:

 (a) Defendant Berman's share of the purchase price, $121,666.66 with $8,613.60 interest as provided in the Purchase Agreement and with $16,016.65 prejudgment interest, or a total of $146,296.91.

 (b) Defendant Berman's share of the loan repayment, $13,000.00 with $1,482.02 prejudgment interest, or a total of $14,482.02.

4. Judgment is entered for defendant Rubin and against plaintiff in the amount of $234,714.03 determined as follows:

 (a) Defendant Rubin's share of the purchase price, $121,666.66 with $8,613.60 interest as provided in the Purchase Agreement and with $16,016.65 prejudgment interest, or a total of $146,296.91.

 (b) Defendant Rubin's share of the loan repayment, $13,667.00 with $1,558.09 prejudgment interest, or a total of $15,225.09.

 (c) Defendant Rubin's back salary, $70,506.47 with $2,685.56 prejudgment interest, or a total of $73,192.03.

5. Judgment is entered for the Cohen defendants and against plaintiff in the amount of $164,863.86 determined as follows:

 (a) The Cohen defendants' share of the purchase price, $121,666.66 with $8,613.60 interest as provided in the Purchase Agreement and with $16,016.65 prejudgment interest, or a total of $146,296.91.

 (b) The Cohen defendants' share of the loan repayment, $16,667.00 with $1,899.95 prejudgment interest, or a total of $18,566.95.

not entertain the Cohen defendants' request that we give effect to this side agreement in computing final damage liability. In addition, since indemnity contracts are strictly construed in favor of the indemnitor, we conclude that the agreement would not reach any attorneys' fees awarded under the Purchase Agreement.